*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0196P (6th Cir.)
File Name: 04a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CRESTVIEW PARKE CARE
CENTER,

*Petitioner,*

*v.*

TOMMY THOMPSON; UNITED
STATES DEPARTMENT OF
HEALTH AND HUMAN
SERVICES,

*Respondents.*

No. 02-4084

On Petition for Review from an Order of the
Department of Health & Human Services.
No. A-02-62.

Argued: December 5, 2003

Decided and Filed: June 28, 2004

Before: KENNEDY, MARTIN, and MOORE, Circuit
Judges.

---

---

## COUNSEL

**ARGUED:** Geoffrey E. Webster, Columbus, Ohio, for
Petitioner. Robert C. Stephens, UNITED STATES
DEPARTMENT OF HEALTH & HUMAN SERVICES,
OFFICE OF THE GENERAL COUNSEL, REGION V,
Chicago, Illinois, for Respondents. **ON BRIEF:** Geoffrey E.
Webster, Columbus, Ohio, for Petitioner. Robert C.
Stephens, UNITED STATES DEPARTMENT OF HEALTH
& HUMAN SERVICES, OFFICE OF THE GENERAL
COUNSEL, REGION V, Chicago, Illinois, for Respondents.

MOORE, J., delivered the opinion of the court, in which
MARTIN, J., joined. KENNEDY, J. (pp. 28-31), delivered a
separate opinion concurring in part and dissenting in part.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Petitioner
Crestview Parke Care Center ("Crestview"), a skilled nursing
facility, appeals an order holding Crestview responsible for a
$27,600 civil money penalty ("penalty"). Following several
inspections of Crestview's Cincinnati facility in 1999,
Respondent Centers for Medicare and Medicaid Services
("CMS") determined that Crestview violated several
regulations and levied a penalty against Crestview. Crestview
requested a hearing to dispute the penalty. The parties filed
briefs and gathered evidence in advance of a hearing, but the
ALJ declined to hold an in-person hearing, believing that the
written record was sufficient to adjudicate the matter. CMS
filed a motion for summary judgment, which the ALJ granted,
reasoning that no genuine issues of material fact existed
regarding any of Crestview's alleged acts of noncompliance.

The ALJ upheld the penalty, finding it to be reasonable. Because genuine issues of material fact do exist as to some of the acts of noncompliance, and it was thus improper not to hold an in-person evidentiary hearing, we **VACATE** the order and **REMAND** for an in-person, evidentiary hearing on the disputed material issues as we outline below.

## I. FACTS AND PROCEDURE

Crestview, a skilled nursing facility, is periodically surveyed by the CMS in order to assure compliance with Medicare and Medicaid regulations. On August 12, 1999, the Ohio Department of Health ("ODH"), which often examines skilled nursing facilities for CMS, *see* 42 C.F.R. § 488.20(a), completed a Life Safety Code survey of Crestview's Cincinnati facility. The ODH surveyors determined that Crestview violated a federal regulation requiring emergency lighting because Crestview's emergency generator failed to start. *See* 42 C.F.R. § 483.70(b)(1).

The following day, the ODH investigators returned and discovered numerous additional infractions. First, the ODH found that Crestview had failed to provide "[h]ousekeeping and maintenance services necessary to maintain a sanitary, orderly, and comfortable interior." 42 C.F.R. § 483.15(h)(2). The surveyors pinpointed fifteen different infractions, including a hole in the tile floor of a restroom, missing ceiling tiles, and dirty showers. Second, the ODH found that some residents did not receive care and services necessary "to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care. 42 C.F.R. § 483.25. Specifically, two residents (Residents 44 and 90), needed elbow or heel protectors to ward off pressure sores, but were observed lying on their beds without these protectors. Third, Crestview failed to ensure that "[a] resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical

condition demonstrates that they were unavoidable." 42 C.F.R. § 483.25(c)(1). Resident 68 had two pressure sores and did not have pressure-relieving devices. Resident 93 was observed wearing pillowed heel protectors that were contaminated with dried serosanginous drainage. Fourth, the ODH alleged that Crestview failed to "[s]tore, prepare, distribute, and serve food under sanitary conditions," 42 C.F.R. § 483.35(h)(2), noting seventeen different food-related violations, including dirty equipment, dried food spills, and potentially botulinus food containers. Fifth, the ODH found that Crestview failed to provide the annual twelve hours of in-service training that were "sufficient to ensure the continuing competence of nurse aides," 42 C.F.R. § 483.75(e)(8)(i), for fourteen of the twenty-nine nurse aides employed at Crestview.

On August 30, 1999, the ODH informed Crestview that it was noncompliant and recommended to CMS that it impose a penalty of $400 per day unless Crestview remedied the problems by October 2, 1999. ODH revisited the facility on October 5, 1999. It discovered not only that Crestview had failed to remedy the deficiencies discovered during the August inspections, but also that it had committed twelve additional housekeeping violations. CMS imposed the $400 per-day penalty. *See* 42 U.S.C. § 1395i-3(h)(2)(B)(ii) (giving the HHS Secretary the authority to impose penalties not to exceed $10,000 per day of noncompliance). A fourth inspection on October 21, 1999, demonstrated that Crestview had remedied the problems and achieved substantial compliance. On November 19, 1999, CMS informed Crestview that it owed $27,600 for sixty-nine days of noncompliance.

Crestview appealed its penalty on December 30, 1999, in accordance with HHS regulations. *See* 42 C.F.R. §§ 498.40(a)(1), 498.5(k). The case was assigned to an ALJ, but just before the filing of the final exhibit and witness lists in December 2000, the case was reassigned to a different ALJ,

who set a hearing date for September 18, 2001. The parties participated in a prehearing telephone conference on September 10, 2001, during which the ALJ admitted all the exhibits that had already been tendered into evidence. The ALJ attempted to delve deeper into the exact nature of Crestview's claims, but found that Crestview's attorneys were unable to answer many of her questions regarding the contours of its appeal.

Tragedy followed on September 11th, forcing the postponement of both the prehearing conference call and the hearing itself. The parties resumed their prehearing teleconference on September 19, 2001. The ALJ learned during the phone call that the parties had failed to stipulate to any factual matters. The ALJ consequently ordered the parties to draft prehearing briefs that would more clearly outline the facts and the legal arguments to be made at the hearing. The ALJ also asked the parties to append all witness affidavits and declarations to these prehearing briefs. The ALJ stated clearly that the record at this point was closed.

The parties then exchanged prehearing briefs. CMS filed its prehearing brief on October 19, 2001, asking for a summary affirmance of the penalty because there were no disputes of material fact. Crestview filed its prehearing brief on November 29, 2001. It challenged all of the facts as presented by CMS and attached declarations from Julie Hrybiniak, the Regional Administrator for Crestview and Alejandro Bayalan, the Food Service Manager at Crestview. Crestview also filed a declaration from accountant Bert Cummins, who had not been previously listed as a witness. Cummins's declaration purported to show that Crestview was unable to pay the penalty. CMS filed its Reply Brief on December 17, 2001, and simultaneously filed a Motion for Summary Judgment, asserting that "there is no material issue of fact, and an adequate factual and legal basis clearly exists for the [penalty] that was imposed." Joint Appendix ("J.A.") at 279 (Mot. Sum. J.). CMS attached two new declarations,

which responded to Crestview's "means to pay" argument, and also asserted that Crestview waived its "means to pay" argument because it did not discuss its financial condition in its original hearing request.

On December 12, five days before receiving CMS's reply brief and motion for summary judgment, the ALJ informed the parties that after reviewing the prehearing briefs and accompanying declarations, she had "determined that an in-person hearing is unnecessary and that this matter can be decided on the basis of the written submissions, declarations, and exhibits," because the written record demonstrated that "certain material facts . . . are not in dispute." J.A. at 277 (ALJ Letter 12/12/01). A week later, Crestview objected to the cancellation of the hearing.

The ALJ granted CMS's motion for summary judgment on February 4, 2002, concluding that the facility was not in substantial compliance and that the penalty was reasonable. At the outset, the ALJ rejected Crestview's argument that the cancellation of the in-person hearing was improper. The ALJ then assessed the evidence on each of the alleged deficiencies, ruling that the facility was not in substantial compliance. In analyzing the reasonableness of the amount of the penalty, the ALJ ruled that Crestview had not properly presented the issue of its ability to pay because Crestview had not discussed its financial condition in its request for a hearing. The ALJ also refused to admit the declaration of Bert Cummins because it had not been listed as an exhibit before December 4, 2000. Partially taking into account the facility's history of failing to satisfy several regulations, the ALJ concluded that the amount of the penalty was reasonable. Crestview appealed the decision to the HHS Departmental Appeals Board ("DAB"), which affirmed the ALJ's decision in its entirety on July 24, 2002. *See* 42 C.F.R. §§ 488.408(g)(1), 498.5(k) (establishing the appeals process). Crestview petitioned us to review the DAB's decision on October 15, 2002. We have jurisdiction

over the appeal of a final DAB decision pursuant to 42 U.S.C. § 1320a-7a(e). *See also* 42 C.F.R. § 498.90(a)(1).

## II. ANALYSIS

Crestview presents several different issues on appeal. First, it alleges various procedural errors. Second, it claims that the ALJ improperly cancelled the in-person hearing for the same reason that a grant of summary judgment was unjustified: there are genuine disputes of material fact for several of the alleged deficiencies. Third, it contends that the ALJ erred in analyzing the reasonableness of the amount of the penalty because the ALJ refused to consider Crestview's "ability to pay" argument and the ALJ accounted for the facility's past history of noncompliance. While Crestview may be incorrect about its first and third arguments, it is correct that the ALJ improperly cancelled the hearing because there are certain genuine issues of material fact that warrant a hearing as explained below. Consequently, we vacate the ALJ's order and remand for further proceedings.

### A. Standard of Review

We review de novo a grant of summary judgment. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is appropriate "[i]f the pleadings, depositions . . . and admissions on file, together with the affidavits . . . show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). CMS, as the movant, has the burden of establishing that no genuine issues of material fact exist. *Logan*, 259 F.3d at 566. The evidence must be viewed in the light most favorable to the nonmoving party, but that party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Richards v. Consol. Rail Corp.*, 330 F.3d 428, 432 (6th Cir. 2003). The mere existence of a "scintilla of evidence" supporting the nonmoving party is not sufficient to

demonstrate that a genuine issue exists, as there must be evidence on which the factfinder, in this case the ALJ, could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

### B. Crestview's Procedural Challenges

Crestview unavailingly asserts that the ALJ made several procedural errors unrelated to the denial of the in-person hearing. First, Crestview asserts that "[the ALJ]'s biased and prejudicial" behavior merits reversal. Pet. Br. at 13. Crestview apparently believes that the ALJ blamed Crestview for several long delays in the proceedings. This argument is without support. The ALJ blamed both parties for the long delay between the closing of the record and the scheduling of the in-person hearing. J.A. at 23 (ALJ Decision). Additionally, the ALJ was relatively lenient with Crestview; Crestview was given a two-day extension for the filing of its prehearing brief and a two-week extension for the filing of its brief in opposition to summary judgment, even though Crestview had clearly missed the twenty-day window for filing a response to CMS's summary judgment motion.

Second, Crestview suggests that it was denied an adequate chance to respond to CMS's summary judgment motion because it was not permitted to submit any evidence in response to issues raised by CMS. Pet. Br. at 7. It is not clear precisely what new issues CMS raised in its summary judgment motion to which Crestview wished to respond via new affidavits or declarations, excluding the issue of Crestview's ability to pay, which was initially raised by Crestview itself. CMS did not receive any evidentiary advantage. The ALJ had forbidden *both* parties from adding new exhibits after December 4, 2000, and the ALJ specifically discounted the new declarations that accompanied CMS's reply brief.

Third, Crestview suggests that CMS's motion for summary judgment was "untimely and unauthorized." Pet. Br. at 9. There is no basis for this claim, as there is nothing to prevent CMS from filing such a motion with its reply brief or at any other time. Furthermore, CMS's prehearing brief asked ALJ Hughes to grant CMS a summary affirmance, putting Crestview on notice of what was to come.

## C. The ALJ's Summary Disposition of Crestview's Claim

Evaluating Crestview's claim that it had a right to an in-person hearing plunges us deep into the thicket of statutes, published regulations, and interpretive rules governing administrative hearings conducted by CMS. The first question is whether the ALJ could resolve Crestview's appeal of the penalty without conducting an in-person hearing. The second subsequent question is whether, assuming an in-person hearing is not always required, the ALJ properly denied Crestview an in-person hearing in this particular case. We answer the first question in the affirmative, but the second in the negative: HHS's interpretive rule for summary proceedings is valid, but the ALJ misapplied it to Crestview's appeal.

### 1. The Right to an In-Person Hearing

The starting point is the Administrative Procedure Act ("APA"), which establishes a detailed set of procedures for formal agency adjudications. These procedures mirror the elements of a judicial trial and establish the proper method of conducting an oral evidentiary hearing. *See* 5 U.S.C. §§ 554(a), 556(d), 557. Agencies need only employ this set of formal adjudication procedures if there is an "adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a). Lower courts have explicitly held that a formal adjudication featuring an oral evidentiary hearing is required by the APA only when a statute explicitly calls for a hearing "on the

record." *Chem. Waste Mgmt., Inc. v. EPA*, 873 F.2d 1477, 1481-82 (D.C. Cir. 1989); 1 Richard J. Pierce, *Administrative Law* § 8.2, at 536-39 (collecting cases) (4th ed. 2002). The Supreme Court has also implied that formal adjudication procedures are only necessary when a statute uses the magic words "on the record." *Cf. United States v. Fla. E. Coast Ry.*, 410 U.S. 224, 237-38 (1973) (holding that formal rulemaking procedures prescribed by 5 U.S.C. §§ 556, 557 are required only when a statute mandates that rules be made "on the record"); *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 548 (1978) (ruling that courts cannot require an agency to use more formal rulemaking procedures than those required by statute); *PBGC v. LTV Corp.*, 496 U.S. 633, 654-55 (1990) (upholding an informal agency adjudication without an oral hearing when the statute did not require a hearing to be on the record).

The statute authorizing the imposition of penalties on skilled nursing facilities, such as Crestview, requires CMS to hold a hearing "on the record." If skilled nursing facilities fail to meet an "applicable requirement," the HHS Secretary "may impose a civil money penalty in an amount not to exceed $10,000 for each day of noncompliance." 42 U.S.C. § 1395i-3(h)(2)(B)(ii). "The provisions of section 1320a-7 of this title (other than subsections (a) and (b)) shall apply to a [penalty] . . . in the same manner as such provisions apply to a penalty or proceeding under section 1320a-7a(a) of this title." *Id.* The referent section provides,

> The Secretary shall not make a determination adverse to any person under subsection (a) or (b) of this section until the person has been given written notice and an opportunity for the determination to be made *on the record* after a hearing at which the person is entitled to be represented by counsel, to present witnesses, and to cross-examine witnesses against the person.

42 U.S.C. § 1320a-7a(c)(2) (emphasis added). The statute clearly includes the "magic words" that invoke the panoply of procedures described by the formal-adjudication provisions of the APA.

In conjunction with the use of the statutory language "on the record," the regulations regarding CMS hearings strongly imply that an in-person, oral evidentiary hearing is generally required. Under the statutory authority to publish rules and regulations, *see* 42 U.S.C. § 1302(a), HHS has promulgated regulations concerning administrative hearings. The regulations establish "procedures for reviewing initial determinations that CMS makes." 42 C.F.R. § 498.3(a)(1). "[I]nitial determinations" encompass: (1)"a finding of noncompliance that results in the imposition of a remedy specified in § 488.406 of this chapter," *id.* at § 498.3(b)(13), and (2) "[t]he level of noncompliance found by CMS in a [skilled nursing facility] or [nursing facility], but only if a successful challenge on this issue would affect . . . the range of [penalty] amounts that CMS could collect." *Id.* at § 498.3(b)(14)(i); *see also id.* at § 488.406 (granting CMS authority to levy penalties). The regulations further state, "Under the circumstances specified in § 431.153 (g) and (h) of this chapter, [a nursing facility] has a right to a hearing before an ALJ, to request Board review of the hearing decision, and to seek judicial review of the Board's decision." *Id.* at § 498.5(k); *see also id.* at § 488.330(e)(3)(ii) (stating that the "provisions of part 498 . . . apply when the following providers," including skilled nursing facilities, "request a hearing on . . . certification of noncompliance leading to an enforcement remedy").

Subpart D of part 498 establishes the regulations for CMS hearings and strongly suggests that oral hearings are required. Only one regulation in this subpart actually uses the term "oral hearing," but the statutory requirement that hearings be "on the record" implies that the term "hearing," as used throughout this subpart of the regulations, refers to a formal

adjudicatory hearing, which includes an in-person component. Section 498.66 states, "If the affected party waives the right to appear and present evidence, the ALJ need not conduct an oral hearing," except during certain circumstances that are inapplicable here. *Id.* at § 498.66(b). This provision powerfully implies that if the affected party does not waive the right to present evidence, the ALJ *must* conduct an oral hearing. Other regulations lead to the same conclusion. They fix a time and place for the hearing and a method for changing the time and place. *Id.* at §§ 498.52, 498.53. They describe the conduct of the hearing. *Id.* at §§ 498.60(a) ("The hearing is open to the parties and their representatives . . . ."); 498.60(b)(1) ("The ALJ . . . receives in evidence the testimony of witnesses and any documents that are relevant and material."); 498.60(b)(3) ("The ALJ decides the order in which the evidence and the arguments of the parties are presented and the conduct of the hearing."). The regulations also contain procedures for the receipt of evidence, *id.* at § 498.61, and rules governing witness testimony. *Id.* at § 498.62.

HHS has created an internal procedure that provides an alternative to in-person, oral hearings. The HHS procedure reads,

> An in-person hearing (i.e., a hearing at which witnesses are called and testify) is not the only vehicle for the [ALJ] to hear and decide the case. If, after giving the parties the opportunity to present their views, the judge determines that there are no genuine issues of material fact, the judge might decide the case based on the undisputed facts and the applicable law. If there are genuine issues of material fact which can be decided on the basis of documentary evidence, the judge might proceed without an in-person hearing.

Dep't of Health & Human Servs., Dep't Appeals Bd., Civil Remedies Div., Procedures, at 1, *available* at

http://www.hhs.gov/dab/civil/procedurescms.html (last visited Feb. 3, 2004). This rule constitutes an interpretive rule that is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (quotation omitted). "Interpretive rules do not require notice and comment[;] . . . they also do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.* We generally give substantial deference to an agency's interpretations of its own regulations. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). However, this deference is limited when an interpretation is "plainly erroneous or inconsistent with the [published] regulation." *Id.* at 944 (quoting *Harris County Hosp. Dist. v. Shalala*, 64 F.3d 220, 221 (5th Cir. 1995)). The reason for this limited deference is to prevent agencies from gaming the rulemaking provisions of the APA, *see* 5 U.S.C. § 553, by creating interpretive regulations that undercut regulations passed through notice-and-comment rulemaking.

Our deference to the HHS's interpretive rule, which is akin to the summary judgment standard contained in Federal Rule of Civil Procedure 56, depends on whether the interpretive rule can be reconciled with the CMS regulations that carry the force of law. On its face, the internal procedure appears inconsistent with the statutory and regulatory provisions because the procedure offers an alternative to an in-person hearing, yet the plain meaning of "on the record" in the statute and the implications of the regulations suggest that there *is* only one vehicle for an ALJ to decide a case: an oral evidentiary hearing.

Nonetheless, it would seem strange if disputes could not be decided without an oral hearing when there are no genuine issues of material fact. Given that federal district courts can decide cases as a matter of law without an oral hearing when it is clear there are no genuine material disputes to be resolved

in a trial, it would be bizarre if administrative agencies, which are in many respects modeled after the federal courts and which indeed often have more informal proceedings than federal courts, could not follow a similar rule. *See* Fed. R. Civ. P. 56; 1 Richard J. Pierce, *Administrative Law* § 8.3, at 542 ("Even when an agency is required by statute or by the Constitution to provide an oral evidentiary hearing, it need do so only if there exists a dispute concerning a material fact."). It may make as good, if not more, policy sense to have a standard for summary judgment in HHS administrative proceedings as it does to have one in federal court proceedings. *See Puerto Rico Aqueduct & Sewer Auth. v. EPA*, 35 F.3d 600, 605-07 (1st Cir. 1994) (describing the structure and validity of administrative summary judgment and stating, "summary judgment often makes especially good sense in an administrative forum, for, given the volume of matters coursing through an agency's hallways, efficiency is perhaps more central to an agency than to a court"). Furthermore, the Supreme Court has upheld the use of summary procedures in other administrative contexts, although only when a party fails to convince an agency at the threshold that the agency should waive a rule or regulation that would otherwise prevent the party from adjudicating its claim. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 621 (1973); *Fed. Power Comm'n v. Texaco, Inc.*, 377 U.S. 33, 39-45 (1964). Therefore, HHS's interpretive rule allowing ALJs to grant summary judgment without an in-person hearing is valid.

## 2. The ALJ Erred By Granting Summary Judgment Without an In-Person Hearing

While HHS's interpretive rule is valid, we hold that it was improperly applied here, and thus summary judgment was not proper. Consequently, we remand this case to the ALJ for an oral hearing. The ALJ erred both procedurally and substantively in deciding the case without an oral hearing.

### a. Procedural Error

The procedure employed by the ALJ was inconsistent with the interpretive rule. The ALJ canceled the in-person hearing on December 12, 2001, after the record had been closed and both parties had filed prehearing briefs, but before any motion for summary judgment had been filed. The prehearing briefs, to which all affidavits and declarations were appended, were designed only to give the ALJ a better idea of what to expect during the hearing, to state the facts that each party intended to prove at the hearing, and to explain how the evidence would help to prove these facts. *See* J.A. at 143 (Order to Submit Briefing). There was no warning that these briefs would be used to determine whether an in-person hearing should occur, and the phrasing of the order requesting the briefs did little to reduce the expectancy of a hearing.

### b. Substantive Errors

Summary disposition of this case without an oral hearing was also improper because there were indeed genuine issues of material fact that may have impacted the determination of whether the penalty was reasonable. The penalty was levied against Crestview because of multiple different infractions. We hasten to note that Crestview has not disputed every alleged deficiency. While Crestview challenges each aspect of the grant of summary judgment, which held that the penalty was reasonable, it is clear that for several of the acts of noncompliance there are no disputes or genuine issues of material fact.

### (i) Undisputed Deficiencies

First, there was no dispute that Crestview failed to provide adequate emergency power. During the August 12, 1999, survey, the Crestview staff was unable to start the emergency generator on three separate occasions. There was also no indication that the generator had been tested on a weekly basis, as is required. Crestview's response that the generator had always worked before the "unknown and unexplained," J.A. at 263 (Hrybiniak Decl.), failure to start in front of the inspector does not contradict the basic observation that the generator's malfunction deprived Crestview of the ability to provide emergency power.

Second, there is no factual dispute regarding all but one of the twenty-seven alleged housekeeping violations. To counter the surveyors' reports of these violations, Crestview presented evidence of cleaning schedules, procedures, and duties in an attempt to demonstrate that the facility is "clean, safe, and well maintained." J.A. at 264 (Hrybiniak Decl.). This evidence established only that Crestview failed in the execution of its procedures, because the surveyors' observations showed that the facility was noncompliant. Crestview's contention that the facility may be observed as unclean at any time because the facility is constantly being used does not rebut the evidence of noncompliance amassed during the survey.

Third, Crestview has not offered evidence challenging most of the alleged food-service deficiencies. The ODH observed seventeen different violations of the regulation that skilled nursing facilities "[s]tore, prepare, distribute, and serve food under sanitary conditions." 42 C.F.R. § 483.35(h)(2). While Crestview challenged seven of the alleged violations, offering alternative rationales for the infractions, Crestview presented no evidence challenging the other ten deficiencies aside from general statements of Crestview's diligence in storing and preparing food in a sanitary fashion, which do little to contest specific claims of noncompliance.

Fourth, Crestview presented no evidence to contest its failure to provide at least twelve hours of in-service training each year for its nurse aides. 42 C.F.R. § 483.75(e)(8)(i). Crestview's 1998 records indicate that fourteen of twenty-nine nurse aides received less than twelve hours of in-service

training in that year.  Crestview did not offer any evidence that these aides actually received the statutorily required training.[1]

### (ii)  Disputed, but Nonmaterial Deficiencies

Factual disputes attend several of the other alleged acts of noncompliance, but some of these disputes are not material. The initial two disputes involve the cleanliness of the facility environment in general, *see* 42 C.F.R. § 483.15(h)(2), and of the dietary services in particular, *see* 42 C.F.R. § 483.35. Summary judgment as to the violation of these regulations was nonetheless proper because these disputes are not material.  First, of the twenty-seven alleged sanitary housekeeping violations, there is a factual dispute concerning the cleanliness of the ice-machine.  Second, there is a factual dispute regarding seven of the seventeen food preparation infractions.  In its opinion, the ALJ assumed that Crestview had not committed these disputed violations, as is proper

---

[1]Instead, Crestview argued that, as a new owner who acquired control on August 1, 1999, it is not responsible for the previous operator's employees and whether those employees received sufficient training. This argument fails as a matter of law, because "[a] facility may not avoid a remedy on the basis that it underwent a change of ownership," 42 C.F.R. § 488.414(d)(3)(i); *see also* 42 C.F.R. § 488.438(f) (including facility's past culpability as a factor in determining amount of penalty); *CarePlex of Silver Spring v. Health Care Fin. Admin.*, Docket No. A-98-94, CR536, DAB No. 1683, 1999 WL 985363 (H.H.S.) at 7 (Apr. 13, 1999) (" [A] facility's history remains a relevant consideration after a change of ownership, but does not foreclose a new owner from rebutting the presumption that the facility's history remains predictive of likely future compliance.").  In purchasing the facility, Crestview assumed responsibility for the noncompliance history of its predecessor-in-interest, and such previous noncompliance is one factor that CMS may consider in assessing the amount of a penalty even though Crestview may not have been directly responsible for the failure to abide by the guiding regulations. Whatever diligence Crestview may have exhibited in moving towards compliance serves only to rebut the presumption that a facility's history tends to predict its future behavior.

when evaluating whether summary judgment should be granted. Nonetheless, the ALJ concluded that Crestview still violated the applicable regulations because the large number of undisputed observations demonstrated that Crestview was not in substantial compliance with 42 C.F.R. §§ 483.15, 483.35.  As a matter of law, we cannot say that the ALJ erred in reaching this conclusion:  the cumulative undisputed infractions suffice to show that Crestview stood in violation of the guiding regulations, even though some of the instances of unsanitary conditions may not have occurred.

### (iii)  The Alleged Disputes Regarding Patient Care

The most serious potential genuine disputes of material fact concern the care of four patients at Crestview's facility (Residents 44, 68, 90, and 93).  For Residents 44 and 90, Crestview allegedly failed to "provide the necessary care and services to attain or maintain the highest practicable physical, mental, or psychosocial well-being, in accordance with the comprehensive assessment and plan of care."  42 C.F.R. § 483.25.  The ODH surveyors observed Residents 44 and 90 without elbow and heel protectors at multiple times during the days of observation, even though physicians had ordered the protectors to be worn at all times because of the high danger of pressure-sore development.[2]  Crestview responds by arguing:  1) the residents did not "need" the protectors because the protectors would not prevent the development of unavoidable sores and because other treatments, such as the use of pressure-relief mattresses, were employed to prevent the development of sores; and 2) the protectors were not

---

[2]It is unclear whether the physician's orders referred to by both parties and the ALJ constitute the "plan of care."  The exhibits in the Joint Appendix to which the parties refer (Resident 44's file is Crestview Exhibit 1, Resident 90's file is Crestview Exhibit 2) contain documents respectively entitled "Physician's Order" (which mentions the phrase "plan of care") and "Care Plan."  *See* J.A. at 342-44, 347-49 (Resident 44 File); J.A. at 356-59, 367-74 (Resident 90 File).

observed on the patients because the residents moved, shifted, or displaced the protectors or because the protectors were removed by staff to provide treatment. J.A. at 252-54 (Pet. Prehearing Br.); J.A. at 264-65 (Hrybiniak Decl.). We emphatically reject Crestview's first argument. Crestview cannot defend an alleged failure to adhere to a physician's orders by contending that those orders are incorrect or misguided. If the staff of a facility believes that a resident does not need protectors or some other treatment ordered by a physician, the proper course of action is to rework the patient's comprehensive plan of care in a venue other than HHS's administrative appeals process. Barring such revision, a facility must follow the plan of care.

Crestview's second argument is different, because it posits that the patients themselves interfered with the implementation of a physician's order. Crestview did not dispute that the protectors were not on the residents, but rather presented evidence, solely in the form of an administrator's affidavit, that it did not violate § 483.25 because the residents moved or shifted the protectors, the residents were uncooperative with care, or the staff removed to protectors to provide other treatment. This evidence suggests not that the doctor's orders were inappropraite, but rather that Crestview did not fully execute them because of patient interference or because of the necessity of other intervening treatments. Consequently, we must assess whether the mere fact that the surveyors saw two patients without heel protectors, which were supposed to be worn at all times, *by itself* is a violation of § 483.25. In other words, is Crestview strictly liable such that it cannot offer reasons for the observed deviations from the comprehensive plan of care?

There is, unfortunately, not a clear answer. In our lone case evaluating § 483.25, *Woodstock Care Ctr. v. Thompson*, 363 F.3d 583 (6th Cir. 2003), we noted that the HHS DAB did not employ a strict-liability standard when evaluating whether a provider achieved compliance under a subsection of § 483.25,

which required a facility to "ensure that . . . [e]ach resident receives adequate supervision and assistance devices to prevent accidents." *Id.* at 589 (quoting 42 C.F.R. § 483.25(h)(2)). We affirmed the DAB's imposition of a penalty. *Id.* at 590. In the administrative decision below, the DAB had held "that the regulatory standard does not amount to strict liability or require absolute success in an obviously difficult task . . . [and] that an element of reasonableness is inherent in the regulation's requirements." *Woodstock Care Ctr. v. Health Care Fin. Admin*, Docket No. A-2000-32, CR 623, DAB No. 1726, 2000 WL 900609 (H.H.S.), at 19 (May 30, 2000) (quotation omitted). Subsequent DAB decisions have confirmed this holding as it applies to § 483.25(h)(2), the regulation governing accident prevention. *Josephine Sunset Home v. CMS*, Docket No. A-03-85, CR 1038, DAB No. 1908, 2004 WL 714959, at 10 (Feb. 9, 2004) (affirming *Woodstock* and listing other cases that decline to impose strict liability). At least one ALJ has also ruled that strict liability does not control § 483.25(m)(2). *See Living Ctr. West v. CMS*, Docket No. C-00-844, CR 988, 2002 WL 31906315 (H.H.S.), at 9 (Dec. 18, 2002) (ruling that "[a]bsent . . . a regulation or ruling of strict liability for any 'missed dose'" under 42 C.F.R. § 483.25(m)(2), the factual circumstances of the deficiency must be considered).

The lack of strict liability in § 483.25(h) does not automatically mean that a violation of the general language of § 483.25 is not a strict-liability infraction, but the use of the word "practicable" in § 483.25 suggests that a party can offer reasons for the failure to adhere to a comprehensive plan of care. The regulation employs the phrase "highest *practicable* physical, mental, and psychosocial well-being," 42 C.F.R. § 483.25 (emphasis added), which suggests that a reasonableness standard inheres in the regulation. Similar to the word "adequate" in § 483.25(h)(2), "practicable" intimates that it is possible for a petitioner to show that there

was a justifiable reason for the violation of § 483.25.[3] Lacking any other guidance from HHS aside from its statements in *Woodstock* and progeny, we conclude that § 483.25 is not a strict-liability regulation.

Crestview has presented some evidence that Residents 44 and 90 were observed without their ordered skin protectors because the residents removed or shifted the protectors or the staff members removed the protectors to provide other treatment. Crestview's evidence in this vein is not strong, chiefly because Crestview has failed to point to any patient records or preserved staff observations of such behavior, but the relative weakness of the evidence in comparison with the observations by the ODH surveyors is not a proper consideration on summary judgment. Upon remand, the ALJ may conclude in fact that Crestview has not proven it acted reasonably in failing to adhere to these residents' plans of care. Nonetheless, taking the evidence in the light most favorable to Crestview, a genuine dispute of material fact exists regarding the violation of § 483.25. Summary judgment without an in-person hearing on the issue of the asserted violations involving these two residents was thus improper.

For Residents 68 and 93, Crestview was cited for failing to prevent the development of avoidable new pressure sores and to provide the necessary treatment to promote healing of preexisting sores. 42 C.F.R. § 483.25(c)(2). To counter the observations of pressure sores on Resident 68, Crestview introduced evidence that Resident 68's pressure sores were

---

[3]It is possible that adhering to a plan of care pursuant to the general language of § 483.25 may conflict with other regulations incumbent upon a facility. For example, if a competent patient consistently refuses to wear protectors, the facility may not be able to force that patient to do so because 42 C.F.R. § 483.15 mandates that a "resident has the right to . . . [m]ake choices about aspects of his or her life in the facility that are significant to the resident." 42 C.F.R. § 483.15(b)(3).

clinically unavoidable. Crestview also asserted that Resident 68 rested on a pressure-relieving mattress to help avoid pressure sores and that the pressure sore observed on the left elbow was successfully treated within thirty days. J.A. at 254 (Pet. Prehearing Br.); J.A. at 265 (Hrybiniak Decl.). As regards Resident 93, Crestview presented evidence that the "dirty" protector reapplied to Resident 93's heel never made contact with his skin, because his foot was rebandaged, such that the allegedly "dirty" protector did not contribute to the development of any pressure sores. J.A. at 255 (Pet. Prehearing Br.); J.A. at 265 (Hrybiniak Decl.). Crestview did not offer any evidence to dispute the surveyor's observation that a dirty heel protector was earlier applied directly against Resident 93's open pressure sore *before* the nurse rebandaged the sore and placed the dirty protector against the clean bandage.

Crestview appears not to dispute that Resident 68 was not wearing heel protectors, but such a "concession" does not negate the existence of a genuine dispute of material fact. The evidence as presented, and taken in the light most favorable to Crestview, shows that Crestview took measures to halt the development of *avoidable* pressure sores and to promote the healing of existing sores. Crestview claims that the pressure sores were unavoidable and that it succeeded in treating other pressure sores affecting Resident 68. Whether these sores were unavoidable and whether Crestview succeeded in preventing and treating the sores are factual questions that should not have been resolved in a summary fashion without a hearing. CMS certainly presented evidence that Crestview violated 42 C.F.R. § 483.25(c)(2), but CMS's evidentiary effort with regards to Resident 68 only reinforces our conclusion that summary judgment (and thus disposition without a hearing) is improper in the face of disputes of material fact.

The same cannot be said of Crestview's evidence regarding Resident 93. Crestview has failed to dispute the surveyor's

observation that a dirty heel protector had been applied directly against an open pressure sore. That the same dirty heel protector was *later* reapplied over clean bandages does not remedy the initial instance of unclean treatment of pressure sores. In evaluating Crestview's noncompliance with § 483.25(c)(2), the ALJ did not consider the appropriateness of applying the dirty heel protector to the resident's bandaged feet, but rather focused on the initial application of the protector to an open sore. Because Crestview failed to challenge this observation, there is no genuine dispute of material fact regarding the violation of § 483.25(c)(2) with regards to Resident 93.

### c. Conclusion

In sum, the ALJ's error in applying the HHS rule that governs the cancellation of in-person hearings sprang from its misapplication of the summary judgment standard, and the dissent falls into the same trap. In evaluating whether summary judgment is proper, we do not weigh the evidence, but rather view the evidence in the light most favorable to Crestview to divine the existence of a genuine dispute of material fact. With regards to the care of Patients 44, 68, and 90 the ALJ, and the dissent, evaluate the strength of Crestview's evidence relative to CMS's evidence, but it is clear such a comparison is improper at this stage of the proceedings. Crestview offers evidence and several different arguments for why its actions were in compliance with the applicable regulations, and CMS proffers different evidence: this is a factual dispute at its essence. This factual dispute makes the cancellation of an in-person hearing improper, but it does not prevent the ALJ from ruling against Crestview upon remand. In reexamining this case, the ALJ may conclude that a $400-per-day penalty is reasonable. The ALJ should determine whether the resolution of the disputed deficiencies in juxtaposition with the deficiencies for which Crestview is undeniably responsible justify the enforcement of the penalty.

## D. The Amount of the Penalty

There are two issues germane to the distinct issues of the reasonableness of the penalty amount: (1) Crestview's ability to pay and (2) whether the ALJ can consider the facility's history of noncompliance in evaluating the reasonableness of a penalty levied against a new owner.

### 1. Ability to Pay

Crestview asserts that the imposition of a $400 per-day penalty was unreasonable because it cannot afford to pay the penalty. Crestview's argument fails for two reasons. First, the ALJ justifiably refused to evaluate this claim because Crestview did not raise it in its initial hearing request. In its hearing request, Crestview never mentioned its financial condition, in derogation of the regulation that hearing requests must identify the specific issues with which the party disagrees. 42 C.F.R. § 498.40(b); *see Cmty. Nursing Home v. CMS*, Docket No. A-01-86, CR 770, DAB No. 1807, 2002 WL 125182 (H.H.S.), at 9 (Jan. 11, 2002) (holding that untimely arguments regarding ability to pay are deemed waived). Crestview disingenuously charges that the ALJ spurned Crestview's financial-condition argument even though CMS raised the issue of ability to pay in its motion for summary judgment, but such protestations ignore the reality that CMS discussed ability to pay only in response to Crestview's novel introduction of the argument in its prehearing brief.

Second, given that the ALJ properly refused to admit the Cummins declaration (because it was tendered after the closing of the record), Crestview presented no evidence of an inability to pay. Crestview did not introduce the Cummins declaration until nearly a year after the parties exchanged exhibit and witness lists and the record was considered closed. Crestview's arguments that CMS gained an unfair advantage because CMS submitted additional declarations to

rebut Cummins's declaration falls flat because ALJ Hughes excluded CMS's new evidence, as well as Crestview's. Moreover, even if Cummins's declaration were a part of the record, summary judgment was still proper.    While Cummins's declaration suggests that Crestview in fact was suffering from heavy losses, "financial losses, even if they are severe, are not enough by themselves to establish an inability of a provider to pay a civil money penalty." *Wellington Specialty Care & Rehab. Ctr. v. Health Care Fin. Admin.*, Docket No. C-97-252, CR548, 1998 WL 673818 (H.H.S.), at 18 (Sept. 15, 1998).  The proper standard for ability to pay is whether the penalty amount would put the facility out of business. *Milpitas Care Ctr. v. CMS*, Docket No. A-02-139, CR932, DAB No. 1864, 2003 WL 974618 (H.H.S.), at 12 (Feb. 5, 2003).  Crestview never asserted that paying the $27,000 penalty would put it out of business, and thus its ability-to-pay argument must fail.

### 2. The Facility's History of Noncompliance

Crestview also contends that the ALJ erred when it accounted for the facility's history of noncompliance in evaluating Crestview's penalty.  There was no error, and on remand the ALJ can again take into account the *facility's* history of violations when considering the reasonableness of the penalty.  The guiding regulations permit exactly such consideration of past noncompliance: "In determining the amount of penalty, CMS does . . . take into account . . . (1) The facility's history of noncompliance, including repeated deficiencies."    42 C.F.R. § 488.438(f)(1).    In adopting its regulations, the HHS specifically stated,

> *A facility's prior compliance history should be considered regardless of a change in ownership.*  A facility is purchased "as is."  The new owner acquires the compliance history, good or bad, as well as the assets. While we agree that after consideration of the facility's compliance history, [CMS] or the State may conclude

that such history is no longer a valid predictive factor of the facility's ability to achieve and maintain compliance (for example, following a change of ownership where the new owner "cleans house") the burden of proof is on the new owner to demonstrate that poor past performance no longer is a predictive factor.

Medicare and Medicaid Programs; Survey, Certification and Enforcement of Skilled Nursing Facilities and Nursing Facilities, 59 Fed. Reg. 56,116, 56,174 (Nov. 10, 1994) (emphasis added) (quoted by *CarePlex of Silver Spring v. Health Care Fin. Admin.*, Docket No. A-98-94, CR536, DAB No. 1683, 1999 WL 985363 (H.H.S.), at 7 (Apr. 13, 1999)); *see also CarePlex*, at 7 ("[This language] presupposes that the facility's history remains a relevant consideration after a change of ownership, but does not foreclose a new owner from rebutting the presumption that the facility's history remains predictive of likely future compliance.").  Crestview cannot be penalized for noncompliance that is the responsibility of prior owners in the sense that a penalty cannot be levied against Crestview for such noncompliance by others.  But, according to the regulations, Crestview can be charged a $400 penalty, as opposed to a $350 penalty, based upon "[t]he facility's history of noncompliance."  42 C.F.R. § 488.438(f)(1).  The regulations clearly demonstrate that the ALJ did not err when it accounted for the facility's past deficiencies, regardless of ownership.  Naturally, upon remand, Crestview can rebut the presumption that past noncompliance accurately predicts future problems.  If Crestview can show that it "cleaned house" when it acquired this particular facility, the facility's history of past noncompliance may no longer be a factor, but conducting such an analysis is not our task today.

### III. CONCLUSION

The ALJ erroneously misinterpreted HHS regulations by deciding the case without an oral hearing because genuine

factual disputes exist for several of the alleged deficiencies. As a result, summary judgment was not appropriate. Therefore, we **VACATE** the order and **REMAND** for further proceedings at the administrative level. Upon remand, an ALJ should conduct an oral, evidentiary hearing to determine whether the previously discussed disputed violations occurred. Then the ALJ should reassess whether the penalty was reasonable. The facility's history of noncompliance may be taken into account, but a facility's history of violations is neither dispositive nor irrebutable, as it is merely one factor that is to be considered.

_____

**CONCURRING IN PART, DISSENTING IN PART**

_____

KENNEDY, Circuit Judge, concurring in part, and dissenting in part. I agree with the majority that the ALJ can grant a summary judgment without an in-person hearing and I agree that Crestview's argument about its ability to pay is without merit. However, I respectfully dissent from the majority's finding that there are unresolved factual disputes in this case.

The majority found that the ALJ committed a procedural error by cancelling the in-person hearing on December 12, 2001 before any motion for summary judgment had been filed. In my opinion, the record before us does not support that legal conclusion. CMS stated in the conclusion to its Pre-Hearing Brief filed on October 19, 2001 that "should Crestview not raise a credible dispute to any material fact in its Response to CMS' Pre-hearing Brief, then this tribunal should grant CMS a summary affirmance of its determinations in this matter." CMS Pre-hearing Br. at 32. In my opinion, the ALJ was fully within her discretion when, upon receiving the parties' pre-hearing briefs, she converted CMS' Pre-hearing brief into a motion for summary judgment. Furthermore, CMS' Reply Brief actually included a motion for summary judgment. It is true that the Reply Brief was not filed until December 17, 2001. However, the reply brief was already scheduled to be filed prior to the December 12, 2001 letter and, more importantly, the ALJ afforded Crestview an opportunity to respond, in writing, to the motion.

I also disagree with the majority's conclusions with respect to Residents 44, 68, and 90. Crestview argued, and the majority agrees, that genuine issues of material fact remain as to whether it provided necessary care and services to Residents #'s 44 and 90. However, the ALJ found, and

Crestview does not dispute, that Resident #44's care plan called for heel protectors at all times (with ankle rings) and bilateral elbow protectors at all times, and that Resident #90's care plan called for heel protectors, elbow protectors, and cone splint from 7 am to 7 pm. The survey also charged that on each of the three days of the August survey, at several different times of the day, Patient #44 was observed without protectors and Resident #90, who had a history of skin breakdowns, was observed sleeping without such protectors and seated in chairs on two occasions without elbow protectors. The regulations require that the facility provide care "in accordance with the comprehensive assessment and plan of care." 42 C.F.R. § 483.25. Crestview, in contesting these two charges before the ALJ, indicated its position was that the protective pads were removed by the staff to check and access the skin. No specific witnesses were mentioned to substantiate that claim. Nor do the disclosures of Crestview's administrative and nursing personnel contain any reference to this claim. Hrybiniak, in her disclosure, does mention that residents do remove protectors. She also states that whether protectors are needed is a nursing judgment and that they are not needed when patients are in bed on a pressure relieving mattress. Crestview's brief in response to the motion for summary judgment argues only that the protective pads were not needed because the patients were on pressure-relieving mattresses. The ALJ found that the claim that the protectors were removed for examination or bathing was unsupported and refuted by the circumstances of the observations, and that it was a violation of the regulations to fail to carry out the doctors' directions. The ALJ also noted that these patients' records include no notations that these patients removed other protecting pads. The ALJ concluded that there was no material issue of fact with respect to whether the physicians' orders had not been complied with.

Crestview also argued, and the majority agrees, that genuine issues of material fact remain as to whether Crestview failed to ensure that one of its residents not develop

avoidable pressure sores, and failed to ensure that a resident having pressure sores received the treatment and services necessary to promote healing, prevent infection, and prevent new sores from developing. More specifically, Resident #68 was diagnosed with multiple sclerosis, dysphagia, iron deficient anemia, and dermatitis. As of July 23, 1999, her pressure sores had healed. Her physician ordered pillowed pressure relieving devices on both feet and both elbows at all times. Resident #68 was unable to position herself. On two different days, the surveyor observed Resident #68 without a relieving device on her left elbow. On August 11, 1999, the surveyor observed that Resident #68 had pressure sores on her left hip, left buttock area, and left elbow. I agree with the ALJ that:

> The facility *is obliged to go beyond* what seems reasonable to, instead, always furnish what is necessary to prevent new sores unless clinically unavoidable, and to treat existing ones as needed. *Koester*, DAB No. 1750, at 32. Allowing Resident #68, a high-risk individual to lie, unprotected, on vulnerable points, in contravention of physician orders, does not establish that the facility took "all necessary precautions."

*Crestview Parke Care Ctr.*, DAB CR867, at 28.

In summary, these Residents had specific needs that were addressed in their physicians' orders. Crestview did not comply with those orders. I would end the inquiry at this point. The majority, on the other hand, has decided to allow Crestview to essentially challenge the "wisdom" and/or "practicality" of those specific orders in the administrative hearing, and, in the case of Resident # 68, to argue whether a violation of the physician's orders was the actual cause of the pressure sore. This decision, in my view, would cause shambles in the administrative oversight of the nursing facilities because it frees these facilities from having to comply with the physician's orders. Instead of simply

checking to see whether the facilities complied with the physicians' orders, the ALJs will be required to conduct hearings to weigh the advantages and the disadvantages of the alternative courses of care provided by the facilities. In my opinion, disagreement with the necessity of strict compliance with physicians' orders ought to be made in the discussions between the physicians and the facility administrators at the time of the physicians' orders. Congress has authorized the ALJs to simply review the facilities' compliance with the physicians' orders; it did not authorize them to review the wisdom or the practicality of those orders.