*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0095P (6th Cir.)
File Name: 04a0095p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WOODSTOCK CARE CENTER,
  *Plaintiff-Petitioner,*

v.

No. 01-3889

TOMMY THOMPSON,
SECRETARY, and UNITED
STATES DEPARTMENT OF
HEALTH AND HUMAN
SERVICES,
  *Defendants-Respondents.*

On Review of the Departmental Appeals Board of the
United States Department of Health and Human Services.
No. 00-00356—Walter H. Rice, District Judge.

Argued: May 8, 2003

Decided and Filed: November 17, 2003[*]

---

[*] This decision was originally issued as an "unpublished decision" filed on November 17, 2003. On March 23, 2004, the court designated the opinion as one recommended for full-text publication.

Before: BOGGS, Chief Judge; BATCHELDER, Circuit Judge; and OBERDORFER, Senior District Judge.[**]

---

**COUNSEL**

**ARGUED:** Geoffrey E. Webster, Columbus, Ohio, for Petitioner. Sheila Ann Hegy, OFFICE OF THE CHIEF COUNSEL, Chicago, Illinois, for Respondent. **ON BRIEF:** Geoffrey E. Webster, Eric B. Hershberger, Columbus, Ohio, for Petitioner. Sheila Ann Hegy, OFFICE OF THE CHIEF COUNSEL, Chicago, Illinois, for Respondent.

---

**OPINION**

---

BOGGS, Chief Judge. Woodstock Care Center ("Woodstock"), in an action against United States Department of Health and Human Services ("HHS") and Tommy Thompson, in his capacity as Secretary of the HHS, seeks review of a Civil Monetary Penalty ("CMP") imposed against Woodstock by the Health Care Financing Administration ("HCFA"),[1] an agency within HHS. A survey of Woodstock, a long-term care facility for mentally disturbed residents participating in the federal Medicare and Ohio Medicaid programs, discovered numerous incidents in which residents had been able to escape from the facility (referred to as "elopement" by the parties) or to assault other residents.

---

[**] The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

[1] During the pendency of this action, HCFA was renamed the "Center for Medicare and Medicaid Services." For consistency, it will nevertheless be referred to as HCFA throughout.

HCFA imposed the CMP under statutory and regulatory authority requiring that facilities prevent accidents or risk of accidents to residents. Woodstock appealed to an Administrative Law Judge ("ALJ") and the Departmental Appeals Board ("DAB") within HHS, both of which affirmed. We affirm as well.

## I

Woodstock is a long-term care skilled nursing facility ("SNF") in Ohio that participates in the federal Medicare and the Ohio Medicaid programs. It houses forty-three residents, half of whom were diagnosed with dementia and more than two-thirds of whom displayed behavioral symptoms of dementia. On February 17, 1998, inspectors of the Ohio Department of Health, under delegated authority from HHS to supervise facilities like Woodstock, and acting upon a complaint by a Woodstock employee, launched a survey of the facility, which concluded on March 4. The inspectors, registered nurses with training and extensive experience in such surveys, conducted four more visits to Woodstock, on March 8, 11, and 15 and April 29. During their survey, they noted the following incidents.

Resident 11[2] was admitted on September 29, 1997, and suffered from organic brain disorder, ethanol alcohol dependency, and seizures. R11 wore an electronic tracking device, which triggered an alarm when the device passed through any door to the outside world. On January 3, 1998, R11 made his first attempt at elopement. He was discovered missing at 11:25 p.m. and was returned eighty minutes later after being found in a roadside ditch by a cornfield, two miles away. In response, Woodstock installed a camera trained on

---

[2]In compliance with federal privacy regulations, all residents are referred to exclusively by a number ("Resident *N*" or "R*N*") in all public court documents.

the fence surrounding a patio area over which R11 was assumed to have fled. On January 21, R11 was noted attempting to climb the fence at 1 a.m., but he returned when asked. At 2 a.m., he once again attempted to scale the fence but failed. At 2:40 a.m., R11 called 911 and asked the police to rescue him from Woodstock. At 4:45 a.m., he finally managed to climb the fence and escape. At 5:30 a.m., he was discovered by a Woodstock staff member wandering the streets without shoes or coat, despite the low temperatures in the January night, and was convinced to return. On February 17 or 19, Woodstock installed an alarm on the fence, but due to lack of training of Woodstock's staff, the alarm only became operational on March 15.

R11 was also violent towards other inmates. Despite having a known history of assault, he was assigned to share a room with a 73-year old resident with organic brain disorder. R11 assaulted his roommate on three occasions in December 1997. The first assault resulted in a scalp laceration that required stapling. A later assault included R11 pulling these staples. R11 also assaulted two other residents while at Woodstock. In response, R11 received counseling and had his medication altered, but without effect. R11 received his first psychological evaluation on March 2, 1998. On March 7, he assaulted another resident.

Resident 3, a 81-year old woman suffering Alzheimer's disease and advancing dementia, was admitted on January 4, 1998. Prior to her admission, she had been a frequent visitor to her husband, also a resident at Woodstock. On the day of her admission, another visitor who remembered R3 as a visitor held open the door for her, allowing her to escape. While she was only able to walk with the aid of a walker, she made it past a large, unfenced pond and rubble from a burned building to a nearby busy street corner. She was found there forty-five minutes later by Woodstock staff, who convinced her to return.

Resident 5, a 74-year old man suffering from Alzheimer's disease and dementia, was admitted on January 2, 1998. At admission, he was heavily medicated and barely aware, or "snowed." Over the following months, Woodstock staff experimented with altered dosage levels in order to allow him to return to a more active mental state. However, whenever dosage levels sank too low, R5 became highly agitated and demanded to leave. On one occasion, on February 20, he became "unsnowed" unexpectedly and managed to escape through a long, unlocked window, opening to an unfenced area, of the room in which Woodstock had placed him. He was returned to Woodstock, displaying scratches, thirty minutes later.

Resident 17, a 70-year old man diagnosed with schizophrenia, dementia, and Parkinson's disease, was admitted on December 2, 1997. R17, who had a history of verbal and physical aggression, delusions, combative behavior, and refusal of care and medications, was on medication for seizures, Parkinson's disease, and anxiety/agitation. While on medication, R17 suffered violent mood swings between gentle states and extreme aggression. While at Woodstock, he committed more than half a dozen assaults against other residents. He attacked one resident four times, causing hematoma on multiple occasions. The assaulted resident also needed 35 sutures to close a head wound caused by R17 breaking a chair on his head. R17 also attacked several other residents. A total of 130 episodes of R17's verbal and physical aggressiveness and combativeness were recorded. Nevertheless, R17 received no psychological or psychiatric care. On February 19, 1998, he committed another assault and was found wearing a belt around his neck. Woodstock discharged him to the Veterans Administration the same day.

Based on these reports and memoranda submitted by the inspectors and on their recommendation, HCFA concluded that Woodstock had allowed conditions to persist that placed patients at risk and was therefore out of compliance with a total of eighteen administrative requirements. While the underlying incidents had largely occurred before the beginning of the survey, HCFA found that the conditions that allowed them to occur had existed at least from March 4, when the survey concluded, through March 16, when Woodstock took sufficient corrective measures. With respect to the most serious administrative violation, deemed to be at the level creating immediate jeopardy to the residents, HCFA concluded that a sufficient remedy was in place on March 15. HCFA assessed a CMP against Woodstock of $33,650: $3,050 for each of the eleven days there was immediate jeopardy to residents and $50 for each of the two remaining days. HCFA also ordered additional monitoring of Woodstock. However, HHS eventually rejected the inspectors' recommendations to terminate Woodstock's provider agreement.

On March 30, 1998, HCFA issued to Woodstock a Notice of Imposition of Remedies. Woodstock requested a hearing, under 42 C.F.R. § 498.40, in front of an HHS ALJ. At the hearing, the three inspectors who had participated in the survey and three of Woodstock's employees testified. The ALJ issued a decision in favor of HHS on all issues. Woodstock appealed to the DAB, which affirmed the ALJ's decision in its entirety. Woodstock then filed a complaint against HHS in the United States District Court for the Southern District of Ohio. In it, Woodstock alleged that the DAB's decision was not supported by reliable, probative, and substantial evidence, that the rationale supporting the decision was arbitrary and capricious, that the decision was contrary to 42 C.F.R. § 482.25(h)(2), and that it violated Woodstock's "federal Constitutional due process rights." The district court concluded that the circuit courts of appeal have exclusive jurisdiction over challenges to CMPs and therefore transferred the case to us.

## II

Some issues, while prominent earlier in the litigation, need not concern us here. There are no substantial disputes remaining about the underlying facts. While the parties stress different facts and slight discrepancies remain on issues such as the exact length of certain elopements, the facts as stated above are consistent with both accounts. Nor is there any question regarding jurisdiction. The parties also agree on the applicable standards of review. Woodstock has not appealed the seventeen incidents of non-compliance at levels below those presenting immediate jeopardy to residents, so we need not consider the daily CMP of $50. The sole issue remaining is whether the undisputed facts constituted, as a matter of law, a violation of 42 C.F.R. § 483.25 that created immediate jeopardy to the residents.

We have jurisdiction to review imposition of CMPs. "Any person adversely affected by a determination of the Secretary under this section may obtain a review of such determination in the United States Court of Appeals for the circuit in which the person resides." 42 U.S.C. § 1320a-7a. "Upon such filing, the court shall have jurisdiction of the proceeding and of the question determined therein." *Ibid.* Our standard of review is highly deferential. "The findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 42 U.S.C. § 1320a-7a. "In reviewing the Secretary [of HHS]'s interpretation of regulations, courts may overturn the Secretary's decision only if it is 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.'" *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). "Further, courts are to 'give substantial deference to an agency's interpretation of its own regulations.'" *St. Francis*, 205 F.3d at 943 (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512). "In sum, if 'it is a reasonable regulatory interpretation

we must defer to it.'" *St. Francis*, 205 F.3d at 944 (quoting *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 94-95 (1995)) (internal alterations omitted).

Federal regulations impose significant requirements on SNFs, such as Woodstock, that participate in the federal Medicare and state Medicaid schemes. "Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care." 42 C.F.R. § 483.25. "The facility must ensure that . . . [e]ach resident receives adequate supervision and assistance devices to prevent accidents." 42 C.F.R. § 483.25(h)(2). "Deficiency means a [facility's] failure to meet a participation requirement specified in the Act or in [42 C.F.R. §§ 483.1-80]." 42 C.F.R. § 488.301. "Substandard quality of care means one or more deficiencies related to participation requirements under . . . § 483.25, . . . which constitute either immediate jeopardy to resident health or safety; a pattern of or widespread actual harm that is not immediate jeopardy; or a widespread potential for more than minimal harm, but less than immediate jeopardy, with no actual harm." 42 C.F.R. § 488.301. "Immediate jeopardy means a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301.

HHS is authorized to impose a CMP on a SNF that is out of compliance with § 483.25. "The Secretary may impose a civil money penalty in an amount not to exceed $10,000 for each day of noncompliance." 42 U.S.C. § 1395i-3(h)(2)(B)(ii). "Penalties in the range of $3,050-$10,000 per day are imposed for deficiencies constituting immediate jeopardy." 42 C.F.R. § 488.438(a)(1)(I). "The per day [CMP] may start accruing as early as the date that the facility was first out of compliance, as determined by [HHS] or the

State." 42 C.F.R. §488.440(a)(1). "The per day [CMP] is computed . . . for the number of days of noncompliance until the date the facility achieves substantial compliance, as determined by [HHS] or the State." 42 C.F.R. § 488.440(b).

In the current case, HHS concluded that Woodstock had failed to "ensure that . . . [e]ach resident receives adequate supervision and assistance devices to prevent accidents." 42 C.F.R. § 483.25(h)(2). In particular, HHS found that Woodstock had not taken the relevant security precautions, such as closer supervision of residents known to be violent or flight risks, including physical restraint where necessary, better psychological and psychiatric counseling and medication of such residents, and more effective perimeter security. This failure resulted in immediate jeopardy to residents. In particular, eloping residents suffered minor injuries during their escapes and suffered the risk of more serious injuries. Aggressive residents inflicted serious injuries on other residents. Next, HHS concluded that the conditions that allowed such incidents to occur existed from at least March 4 through March 14. For each of these eleven days that the conditions were known to exist, HHS imposed the minimum daily CMP for conditions creating immediate jeopardy to residents, $3,050. The ALJ and the DAB affirmed this judgment.

Woodstock contends that § 483.25(h)(2) is not applicable to the incidents listed because none of them were "accidents." Rather, Woodstock argues, the elopements and assaults were intentional acts by the residents and intentional acts cannot be characterized as accidents. The ALJ rejected this argument by pointing out that the assaults were not intentional on part of the victims and therefore may be regarded as accidents. However, we need not rule on the validity of this contention, which could render practically every assault or murder an accident, because, as the DAB recognized, the legal issue here is whether Woodstock "ensure[d] that . . . [e]ach resident receive[d] adequate supervision and assistance devices to

prevent accidents." 42 C.F.R. § 483.25(h)(2). The cited incidents, regardless of whether they were accidents or not, constitute valid probative evidence as to whether Woodstock adequately supervised the residents. A resident so ill-supervised that he has the opportunity to assault other residents repeatedly and severely may well also be inadequately supervised to prevent accidents. More significantly, a resident who has eloped and wanders an environment dangerous to him or her is completely without *any* supervision. Again, this is so regardless of whether the elopement itself can legally be characterized as an accident.

Woodstock also contends that HHS, in imposing a CMP, held it to a strict liability standard and, under any standard of reasonable care, it had not acted wrongly. Woodstock contends that the attacks and elopements were unprovoked and unpredictable and could not have been prevented. However, the ALJ and the DAB explicitly held that the standard Woodstock faced was not a strict liability standard. Rather, they found that Woodstock had failed to take all reasonable precautions against residents' accidents. The question whether Woodstock took all reasonable precautions is highly fact-bound and can only be answered on the basis of expertise in nursing home management. As such, it is a question the resolution of which we defer to the expert administrative agency, the HHS. But even from our inexpert perspective, numerous actions undertaken by Woodstock would appear to be negligent. For example, allowing R11 to continue to share a room with a helpless resident whom he had already several times severely assaulted seems to border on recklessness. So does failing to restrain R11 after several escape attempts in one night until he finally succeeded, as well as keeping R5 in a room with a large, unlocked window, despite the fact that he was known to be an escape risk. On this basis, we uphold HHS's finding that Woodstock failed to meet the requisite standard of care.

Woodstock argues that at common law there was no presumption of negligence against nursing homes whose residents escape and nursing homes were not the insurers of the safety of their patients but needed only exercise reasonable care. This is only marginally relevant. In the current case, Woodstock was not sued in tort by an injured resident. Instead, Woodstock suffered an administrative penalty under regulations to which it consented when it was permitted to participate in the Medicare and Medicaid programs. These regulations can and do set a higher standard than the common law.

Finally, Woodstock argues that the eloping residents were not in immediate jeopardy and that the elopements therefore were not a valid basis for imposition of CMPs at the increased level. "Immediate jeopardy means a situation in which the provider's noncompliance with one or more requirements of participation has caused, *or is likely to cause*, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301 (emphasis added). The only actual injuries in the record caused by the elopements were the scratches suffered by R5 and the possible aggravation of pneumonia suffered by R11 during the hours he spent outside during a January night without shoes or coat. The former was not a serious injury and the latter, speculation. Nevertheless, we uphold the HHS finding of immediate jeopardy. Given the number of elopements at Woodstock over the course of a few months, the vulnerable state of the residents, and the dangers of the outside world to residents in such a state, the conclusion that, earlier or later, the elopements would likely cause serious injury was supported by substantial evidence. Even in the absence of "actual harm," a "widespread potential for more than minimal harm" is sufficient to sustain the CMP. 42 C.F.R. § 488.301.

### III

For these reasons, we **AFFIRM** the Department of Health and Human Service's imposition of civil monetary penalties.