**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0957n.06
Filed: December 8, 2005

**No. 04-4283**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

VANDALIA PARK,

       Petitioner,

v.

MICHAEL O. LEAVITT, Secretary of Health
and Human Services and DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

       Respondents.

ON APPEAL FROM THE
DEPARTMENTAL APPEALS BOARD OF
THE DEPARTMENT OF HEALTH AND
HUMAN SERVICES

_____/

**BEFORE:**    **SILER, CLAY and ROGERS**, **Circuit Judges.**

     **CLAY, Circuit Judge.** Petitioner, Vandalia Park, a skilled nursing facility participating in

the federal Medicare Program and in the Ohio Medicaid Program, appeals from a final agency

decision by the U.S. Health and Human Services Departmental Appeals Board ("DAB") upholding

the decision by the Administrative Law Judge, ("ALJ") that a 42 C.F.R. § 483.13 violation had

occurred wherein the facility, Vandalia Park, failed to follow policy and procedure and adequately

investigate accusations of sexual assault, and also upholding the accompanying $3400 per instance

civil monetary penalty ("CMP"). For the reasons set forth below, we **AFFIRM** the DAB's decision.

## I. BACKGROUND

Petitioner is a skilled nursing facility located in Vandalia, Ohio. Petitioner participates in and receives reimbursement from the Medicare program. Its participation in Medicare is governed by sections 1819 and 1866 of the Social Security Act and by federal regulations at 42 C.F.R., Parts 483 and 488. As a condition of its participation in the program, Petitioner must submit to random surveys by the Ohio Department of Health ("ODH"), on behalf of the Centers for Medicare and Medicaid Services ("CMS"), to insure that the facility is in compliance with program requirements. The issues in this case arise from a survey conducted by ODH on April 9, 2002, at which time Petitioner was found not to be in substantial compliance with several of the federal requirements for nursing homes. At the heart of this appeal are several allegations by three different residents of sexual abuse by members of Petitioner's staff, and Petitioner's response to these allegations.

1.

In the first incident, nurse aide Janet Saunders reported that, in September 2001, she witnessed the sexual abuse of Resident 6, a 20-year old totally dependent quadriplegic resident, by a male nurse aide (Nurse Aide #1). Saunders said she saw Nurse Aide #1 leaning on the resident's bed with his hand touching the resident's genital area. Saunders claims that she confronted Nurse Aide #1 and immediately reported the incident to the Director of Nursing, who told her to write a written report of what she saw. According to Saunders, she submitted the written report as

requested, but the then Director of Nursing denies ever receiving the written report, and no such report was ever located. Resident 6 was not examined by her physician, and the authorities were not notified.

Saunders wrote a second report in February 2002 regarding the September 2001 incident. In response to this report, Petitioner still never performed a nursing assessment or a physical examination, nor did Petitioner report the incident to law enforcement, although an internal incident report was generated. Resident 6 was finally examined by her physician and a pediatric gynecologist on March 29 and 30, 2002, over six months after the incident allegedly occurred.

2.

Resident 124 was a 37-year old woman diagnosed with, among other things, schizophrenia and dementia, who informed nursing staff that she had been sexually abused by Nurse Aide #2. According to a social services progress note dated February 11, 2002, Resident 124 reported that Nurse Aide #2 had "gotten on top of her and put his thing inside her private area."

Another social services progress report dated February 14, 2002 recounts two other incidents of alleged sexual abuse reported by Resident 124, including an alleged incident involving Nurse Aide #1. The report also reveals that the resident made a comment referring to the fact that she did not like "black guys," only "white guys," and indicated that she was upset by what had happened but that she was not hurt. Both of the nurse aides accused of abuse by Resident 124 were black males. The social worker informed Petitioner's administration of the alleged abuse on February 14, 2002.

Resident 124's family was contacted by the social worker on February 15, 2002 (one day after the incident was reported). The social worker informed the Resident's sister-in-law of the abuse allegations, and told her that they were being investigated. The sister-in-law reportedly told the social worker that Resident 124 makes these types of allegations against black males everywhere she goes.

The nursing home incident report reveals that the victim was interviewed by the administration. The form had a check next to a preprinted statement on the form that said, "Suspect that an abuse, neglect/misappropriation incident occurred but were unable to confirm it." Resident 124 was not examined, her physician was not informed, and the authorities were not contacted.

3.

Resident 141 was a 74-year-old woman with a history of mental illness. On February 14, 2002, Resident 141 reported to a nurse aide that, "that man last night put his hands all up inside me" and pointed at her private parts. When asked to identify the nurse aide responsible, Resident 141 apparently identified Nurse Aide #1 as the man in question. The nurse aide who spoke to the resident reports that she was concerned because she had heard rumors of a similar allegation the day before by a resident on another ward against the same man, and that Nurse Aide #1 had been banned from the ward in question. The nurse aide reported the incident to her nurse on duty and to the unit manager.

Later the same day, the social worker spoke to Resident 141, who repeated her allegations of sexual abuse. The nursing home incident report reveals that following this incident, Nurse Aide #1 was banned from the facility, and both his agency and the Ohio Dept. of Aging were notified.

4

The form also shows that there were grounds to suspect that abuse had occurred, and that the Dept. of Health was informed. The authorities were not contacted. No nursing assessment or physical examination of Resident 141 was performed.

The resident's physician was contacted on March 15, 2002, when a nurse wrote a note to the physician asking that Resident 141 be given a body audit or exam. The physician responded that "if the exam not done timely – not of value," so no examination ever occurred. Resident 141's family was notified of the alleged abuse on March 15, 2002.

4.

At the time of the alleged incidents of sexual abuse recounted above, Petitioner had in place a number of written policies and procedures for handling allegations of abuse and neglect against residents. Petitioner's internal policy states in pertinent part:

> Incidents of all alleged abuse, neglect, misappropriation of property will be fully investigated . . . The alleged victim will receive necessary interventions from all appropriate care team members to ensure the resident's well being and safety during and after the investigation . . . At the completion of the investigation a report will be made to the appropriate authorities, the sheriff, or others as indicated . . . As required by nursing home regulations, when an allegation of abuse has occurred, a report will be made to the Ohio Department of Health regardless of the outcome of the facility's investigation.

There are also several relevant written procedures for handling allegations and investigations of abuse. Most notably, the procedures require: (1) that any non-resident reported to be mistreating, abusing, harassing or intentionally causing harm to a resident will be immediately removed from the facility and law enforcement notified; (2) a nursing supervisor is to contact the resident's physician and administrator (within an hour or at the earliest opportunity), and family; (3) an attending physician should be contacted to request orders for physical examinations and collection of evidence

5

following all allegations of sexual abuse; and (4) materials or documents pertinent to investigation must be collected, retained and safeguarded by the administration.

On April 9, 2002, Petitioner was surveyed by ODH and was found to not be in substantial compliance with federal requirements for nursing homes participating in the Medicare and Medicaid programs. At issue in this appeal is Petitioner's violation of 42 C.F.R. § 483.13(c), which requires skilled nursing facilities to "develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents . . . ." Based on this deficiency, CMS imposed a per instance civil monetary penalty ("CMP") of $3400.

The Statement of Deficiencies and Plan of Corrections, issued by Health and Human Services ("HHS"), indicates that record review and staff interviews revealed that the facility had failed to immediately investigate the witnessed sexual assault of Resident 6 in September 2001, the two alleged incidents of abuse to Resident 124 in February 2002, and the alleged incident of sexual abuse against Resident 141 in February 2002. Of primary concern to investigators was the fact that reports were not timely made to physicians, law enforcement was not contacted, families were not notified, and that Nurse Aide #1 was apparently allowed to continue working at the facility following allegations of abuse.

Prior to this appeal, Petitioner requested and was granted a hearing before a HHS ALJ pursuant to 42 U.S.C. § 1395i-3(h)(2)(B)(ii). The ALJ conducted an in-person hearing on July 1, 2003, and made 12 findings, primarily upholding the CMPs imposed by CMS, including the $3400 CMP for the deficiency at issue in this case. The ALJ did find, however, that CMS did not establish

that Petitioner allowed its residents to be sexually abused, and therefore found no basis for the $6600 penalty associated with that particular violation.

Both CMS and Vandalia Park appealed the ALJ's decision to the Departmental Appeals Board ("DAB"). A three member panel of the DAB affirmed the ALJ's decision and adopted the ALJ's findings with modifications not at issue here.

Petitioner now appeals to this Court for review of the final agency decision, requesting reversal only as it relates to affirmance of the violation of 42 C.F.R. § 483.13 (c) and the imposition of the accompanying $3400 CMP.

## II. DISCUSSION

This Court has jurisdiction to review imposition of CMPs. *Woodstock Care Center v. Thompson*, 363 F.3d 583, 588 (6th Cir. 2003). "Any person adversely affected by a determination of the Secretary under this section may obtain a review of such determination in the United States Court of Appeals for the circuit in which the person resides." *Id.* quoting 42 U.S.C. § 1320a-7a. "Upon such filing, the court shall have jurisdiction of the proceeding and of the question determined therein." *Id.* "The findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 42 U.S.C. § 1320a-7a. "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Myers v. Secretary of Health & Human Svcs.*, 893 F. 2d 840, 842 (6th Cir. 1990).

"In reviewing the Secretary of HHS's interpretation of regulations, courts may overturn the Secretary's decision only if it is 'arbitrary, capricious, an abuse of discretion or otherwise not in

accordance with the law.'" *St. Francis Health Care Center v. Shahala*, 205 F.3d 937, 943 (6th Cir. 2000) (quoting *Thomas Jefferson Univ. v. Shahala*, 512 U.S. 504, 512 (1994)). Courts are to give substantial deference to an agency's interpretation of its own regulations." *St. Francis Health Care Centre v. Shahala,* 205 F.3d at 943. "If it is a reasonable regulatory interpretation . . . we must defer to it." *Id*. (quoting *Shahala v. Guernsey Memorial Hosp*., 514 U.S. 87, 94-95 (1995)).

1.

The DAB's affirmance of the ALJ's finding that Petitioner was in violation of 42 C.F.R. § 483.13 (c) is supported by substantial evidence. The ALJ found and we agree that the evidence in this case does support a finding that Petitioner failed to treat allegations of sexual abuse with the seriousness that is required by its own policies and by governing regulations. Petitioner has failed to provide evidence that the alleged instances of sexual abuse at issue in this case were properly investigated and reported to the appropriate authorities.

There is no doubt that Petitioner had the required policies in place. Petitioner's written policy and procedures indicate that in cases of sexual abuse of residents by staff members: the resident's statement should be taken, witnesses interviewed, evidence collected, families of the resident notified, law enforcement notified, detailed reports issued to the state, and attending physicians of the residents notified. Unfortunately, the record shows that these procedures were not followed in response to the allegations of abuse at issue here.

In the case of Resident 6, Petitioner did an abysmal job of investigating the alleged incident. Janet Saunders was quite emphatic that she witnessed Nurse Aide #1 abusing Resident 6 in September 2001. Saunders also insists that she went immediately to the Director of Nursing with

this information, and that she submitted a written statement of what she had witnessed. Petitioner seeks to discredit the testimony of Saunders by suggesting inconsistencies in her statement; however there do not appear to be any significant inconsistencies in Saunders' story.

Furthermore, although Petitioner denies having any knowledge of the incident at all until February 2002, the evidence indicates that even after acknowledging that it was aware of the alleged abuse, Petitioner still failed to implement its own policies and act appropriately. Petitioner admits that it did not notify Resident 6's family of the alleged incident until March 28, 2002, over a month after it claims to have become aware of the situation. Even more alarming, Resident 6 was not examined by her physician or the Pediatric Gynecologist until March 29, 2002, six months after the alleged incident occurred. This was a violation of Petitioner's own policy which requires that the physician, administrator, and family should all be contacted within one hour or at the earliest opportunity given extenuating circumstances.

Moreover, there is also some suggestion that Petitioner failed to protect documents and evidence related to the abuse incident involving Resident 6. If in fact a written statement was given by Saunders to the Director of Nursing, then the facility had a responsibility to collect, retain and safeguard such evidence, which it failed to do.

Similarly, Petitioner failed to follow policy and procedures with regard to the allegations of sexual abuse of Residents 124 and 141. Resident 124's family was notified by the social worker of the alleged abuse a day after the incident was reported, but Resident 124 was not examined by her physician. Resident 141's family was not notified of her alleged abuse until a month after the

alleged incident, and she was also not examined. In both cases, law enforcement was not notified as required by Petitioner's internal policy.

Overall, Petitioner maintains that its response to the abuse allegations was appropriate given the likelihood that abuse actually occurred. Petitioner insists that there was no actual abuse of any of these residents. Petitioner wants this Court to accept its position that the fact that these allegations were made by mentally-ill residents is justification for its failure to involve physicians and law enforcement. Notably Petitioner states, "if the facility were to call the police each and every time such a person made such a mere accusation, whether because of attention-seeking behavior or simply because the resident was delusional, both police and the facility would quickly tire." It goes on to argue that the facility should have been permitted to exercise some judgment when determining whether an investigation was warranted. The reality, however, is that Petitioner's own policies do not allow it to exercise its judgment, nor do the federal regulations governing its participation in the Medicare/Medicaid program. Petitioner was required to follow its own policies and procedures, and having failed to do so, it was subject to sanctions.

We also agree with the ALJ and the DAB that even though in retrospect there might not be enough evidence to support an actual finding of abuse, the allegations were certainly sufficient to warn Petitioner's management that there was a possible pattern of sexual predation against residents by one or two members of Petitioner's staff. Although there was some evidence in the record to suggest that Resident 124's allegations may have been motivated by racial animus and a desire to leave the facility, the record clearly indicates that the allegations of abuse of Residents 6 and 141 were also charged against Nurse Aide #1. There is no evidence that any of these women were

10

roommates or had contact with one another. In fact, Resident 6 is completely immobile and does not speak, and the allegations were made by a fellow nurse aide.

If, as Petitioner contends, there was legitimate doubt and concern about the truth of the allegations, then all of this should have been communicated to the state and law enforcement officials. Moreover, in the case of Residents 124 and 141, the investigative reports indicate that Petitioner initially considered that "actual abuse may have occurred but that they were unable to confirm it." This directly contradicts Petitioner's contention that it did not take the matter further because it was certain that no abuse had occurred.

For the foregoing reasons, we conclude that the findings of the DAB that Petitioner did not adequately investigate allegations of sexual abuse are supported by substantial evidence.

2.

Since the findings of the DAB are supported by substantial evidence, the Secretary's decision to impose a per instance CMP of $3400 pursuant to 42 U.S.C. § 1395i-3(h)(2)(B)(ii) was not arbitrary and capricious, nor an abuse of discretion. HHS is authorized to impose a CMP on a skilled nursing facility violates § 483.13. 42 U.S.C. § 1395i-3(h)(2)(B)(ii). HHS was authorized to levy a penalty of up to $10,000. In the current case, HHS concluded that Petitioner "failed to immediately and fully investigate one witnessed sexual assault to Resident 6 in September of 2001, two alleged incidents of sexual abuse to Resident 124 on February 11, 2002, and February 14, 2002, and one alleged incident of sexual abuse to Resident 141 on February 14, 2002." HHS further found that the facility "failed to ensure all witnessed or alleged violations involving mistreatment or abuse

of residents were reported immediately to the Administrator of the facility for Residents 124 and 6."

Therefore, the $3400 per instance CMP was properly imposed.

This Court agrees that the imposition of the CMP for violation of the pertinent regulation was not arbitrary, capricious or an abuse of discretion.

## III. CONCLUSION

In conclusion we find that the Secretary's determination that Petitioner failed to adequately investigate claims of sexual abuse of residents by members of the nursing staff was supported by substantial evidence, and that the $3400 per instance civil monetary penalty assessed against Petitioner was not arbitrary and capricious. Therefore, we **AFFIRM** the decision of the DAB.