UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-1329**

LIBERTY COMMONS NURSING AND REHAB CENTER - ALAMANCE,

Petitioner,

v.

MICHAEL LEAVITT, Secretary of the United States Department of Health & Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES,

Respondents.

On Petition for Review of an Order of the United States Department of Health & Human Services.  (A-06-80)

Argued:  March 20, 2008               Decided:  July 18, 2008

Before GREGORY and SHEDD, Circuit Judges, and William L. OSTEEN, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.  Judge Shedd wrote a dissenting opinion.

**ARGUED:** Joseph L. Bianculli, HEALTH CARE LAWYERS, P.L.C., Arlington, Virginia, for Petitioner.  Donald J. Calder, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Office of the General Counsel, Atlanta, Georgia, for Respondents.  **ON BRIEF:** Daniel Meron, General Counsel, Howard H. Lewis, Acting Regional Chief Counsel, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Office of the General Counsel, Atlanta, Georgia, for Respondents.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Liberty Commons Nursing and Rehab Center ("Petitioner"), seeks review of a final decision by the Departmental Appeals Board ("DAB") of the U.S. Department of Health and Human Services ("DHHS"). The DAB affirmed the imposition of a civil monetary penalty ("CMP") upon Petitioner for failure to be in substantial compliance with federal regulatory standards governing certification as a skilled nursing facility. This court has "jurisdiction over the appeal of a final DAB decision pursuant to 42 U.S.C. § 1320a-7a(e)." Crestview Parke Care Ctr. v. Thompson, 373 F.3d 743, 746 (6th Cir. 2004); see also 42 U.S.C. § 1320a-7a(e); 42 C.F.R. § 498.90(a)(1). For the reasons set forth below, we affirm the decision of the DAB.

I

Petitioner is a Medicare-certified nursing facility located in Burlington, North Carolina. The certification signifies that Petitioner has met the Long Term Care Requirements of Participation ("ROP"), allowing it to participate in the Medicare Program for Medicare and Medicaid funding.[1] Facilities that participate in this program are subject to annual inspections by the Centers for

---

[1]The substantive requirements of participation are listed in 42 U.S.C. § 1395i-3.

Medicare and Medicaid Services[2] ("CMS"), for the purpose of determining a facility's continued compliance with the ROPs.[3]

On November 11, 2004, the North Carolina State Survey Agency ("SSA") inspected Petitioner's facility.[4] Following the inspection, the SSA cited Petitioner for a violation of 42 C.F.R. 483.25(h)(2), which is regulatory noncompliance that posed "immediate jeopardy" to a single resident ("Resident").[5] Specifically, the violation stated that Petitioner "failed to put interventions in place to prevent elopement of 1 of 1 sampled residents." (J.A. 1.) As a result of the SSA's finding, the Secretary of the DHHS imposed upon Petitioner a CMP. Petitioner applied to the DAB for a review of the imposition of the CMP. During an oral administrative hearing, an administrative law judge

---

[2]Centers for Medicare and Medicaid Services is an agency of the federal Department of Health and Human Services that is in charge of administering the Medicare program. See MacKenzie Med. Supply, Inc. v. Leavitt, 506 F.3d 341, 343 (4th Cir. 2007). It operates as an agent of the Secretary of DHHS.

[3]All participating facilities are subject to annual state surveys to determine if they comply with the Medicare and Medicaid participation requirements. 42 U.S.C. § 1395i-3(g)(2)(A)(iii)(I).

[4]The Secretary of the Department of Health and Human Services is permitted by statute to enter into agreements with state agencies; for example the North Carolina State Department of Health and Human Services. Such agreements allow a state agency (the SSA) to act as an agent of the Secretary. See 42 U.S.C. § 1395aa. In this case, an agreement existed that enabled the SSA to conduct surveys for the purpose of determining Petitioner's compliance with federal regulations.

[5]Regulatory noncompliance with 42 C.F.R. 483.25(h)(2) is also commonly referred to within the DHHS as a violation of F Tag 324.

("ALJ") made the following findings of fact, which we adopt in their entirety as they are not disputed on appeal.

A.   Administrative Law Judge's Findings of Fact

Prior to May 2003, Petitioner operated a locked wing in its facility, referred to as the Special Care Unit. Resident, an 87-year-old woman with severe Alzheimer's disease and osteoporosis, was housed in Petitioner's Special Care Unit from September 2000 until May 2003 due to her "high risk for elopement as the result of her numerous medical and psychological ailments." (J.A. 370.)

In May 2003, Petitioner converted the Special Care Unit to a rehabilitation unit. The new unit did not provide the same level of services and security as that of the Special Care Unit. Accordingly, Petitioner advised Resident's family about the need to move Resident to another facility. The family urged Petitioner to allow Resident to remain at her current location. Despite Petitioner's concerns, Petitioner reluctantly allowed Resident to remain at the facility. During Resident's stay in the rehabilitation unit, she eloped on several occasions.[6]

Petitioner documented in writing each time Resident eloped. The first time Resident eloped was June 2, 2003, when she simply walked out of Petitioner's facility. To prevent future elopements,

_____

[6]According to the record before the court, Resident began to elope on June 2, 2003, less than a month after moving into the new unit. Petitioner documented five additional elopements which occurred on June 23, August 14, September 19, November 6, and November 7, 2004.

5

Petitioner placed a Wander Guard transponder on Resident's ankle that would trigger an alarm if Resident eloped through the front door. Other doors, however, were not equipped with a Wander Guard alarm. Despite this precaution, Resident managed to elope undetected through exit doors other than the front door.

On September 19, 2004, Petitioner became aware of the manner in which Resident eloped without detection. Another resident observed Resident flip a bypass switch that disabled an electronic door lock and allowed Resident to exit through a back door.[7] Petitioner located Resident on this date after she had wandered through a fence, down a grassy slope, and into a parking lot. In response to Resident's actions, Petitioner placed pieces of paper over the bypass switches in an attempt to confuse or distract her.[8] On November 6, 2004, Resident, undeterred by the paper-covered switches, again disabled the electronic lock and eloped through the rear exit doors. The following day, Resident also attempted to elope through the front door, but her Wander Guard triggered an alarm and she was promptly retrieved by two visitors.

---

[7]All of Petitioner's doors were controlled by electronic locks. No door, with the exception of the front door, was equipped with an alarm system that would alert the staff in the event that a resident exited the facility.

[8]Petitioner has argued that "distraction" is a common method of deterring conduct by residents with Alzheimer's disease. Although an untested technique in this context, Petitioner placed paper over the bypass switches in order to distract her from operating the bypass switches.

B.    The Centers for Medicare and Medicaid Services Inspection

On November 11, 2004, the SSA conducted an annual inspection of Petitioner's facility and sent its findings to CMS. After the inspection and review of Petitioner's records and facility, termed a "survey," CMS found that Petitioner failed to comply with federal regulations governing care facilities approved for Medicare and Medicaid funding, and imposed a CMP. Specifically, CMS found that Petitioner was not operating in substantial compliance with nursing home regulations that require facilities to provide adequate supervision of its residents to prevent accidents.

CMS found that Petitioner was not in compliance because Petitioner had failed to take appropriate steps to prevent Resident from repeatedly eloping from its facility. (J.A. 5.) As a result of CMS's inspection, Petitioner decided to install squeal boxes (alarms) on the bypass switches to alert the staff when a bypass switch was activated. The squeal boxes were installed on November 16-17 and were fully operational on November 19, 2004. CMS conducted a follow-up survey on November 18, 2004, after which CMS determined that Petitioner's noncompliance constituted "immediate jeopardy" from the date Petitioner was aware of Resident's means of elopement, September 19, 2004, until the squeal boxes were installed on November 17, 2004. Additionally, CMS found that Petitioner's noncompliance continued at a level below immediate jeopardy from the time the squeal boxes were installed until the

7

staff was trained on how to respond to the alarms on November 18, 2004. Accordingly, Petitioner was fined $3,050 per day from September 19, 2004 through November 17, 2004, and $50 per day on November 18, 2004, resulting in a total fine of $180,000.[9]

C.    The DAB Proceeding

Following CMS's imposition of fines, Petitioner requested an administrative review of the CMP by the DAB. As provided by statute, the DAB afforded Petitioner a hearing before an ALJ. The ALJ conducted a hearing on December 15, 2005, and affirmed CMS's findings. Petitioner then appealed the ALJ's decision to the Appellate Division of the DAB.[10] The DAB Appellate Division reviewed and affirmed the ALJ's decision. This case is now before this court on appeal of the final decision of the DAB.

Standard of Review

In this case, the Secretary of DHHS ("Secretary")[11] made findings of fact to support the conclusion that Petitioner was not

_____

[9]There is great discrepancy within the various documents before the court as to the amount of the fine. The total amount should be $180,000. This represents a fine of $3,050 each day from September 19 - November 17 (59 days) and a fine of $50 on November 18 (1 day): 59 x $3,050 = $179,950 and 1 x $50 = $50. $50 + $179,950 = $180,000.

[10]Initially, Petitioner moved to reopen the case in order to submit additional evidence, but the request was denied.

[11]For the purposes of this opinion, the decision of CMS will be treated as that of the Secretary.

8

in substantial compliance with 42 C.F.R. § 483.25(h)(2), and that such noncompliance resulted in both immediate jeopardy and the potential for minimum harm. We review the Secretary's factual findings to determine if they are supported by substantial evidence. 42 U.S.C. § 1320a-7a(e) ("The findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive."). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (citation and internal quotations omitted). This level of evidence is further defined as "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). The Secretary's legal conclusions are subject to a highly deferential standard of review. By regulation, a determination of noncompliance must be upheld unless that decision is clearly erroneous. See 42 C.F.R. § 498.60(c)(2).

Governing Regulations: Adequate Supervision and Assistance

This case is governed by regulations set forth in the Code of Federal Regulations, which provides standards to which nursing homes must conform in order to qualify for participation in Medicare and Medicaid funding. The regulation at issue in this

9

case, 42 C.F.R. § 483.25(h)(2), states that a facility must ensure that "[e]ach resident receives adequate supervision and assistance devices to prevent accidents." 42 C.F.R. § 483.25(h)(2). An "'accident' is defined in the State Operations Manual (SOM) issued by HCFA as 'an unexpected, unintended event that can cause a resident bodily injury.'" Woodstock Care Ctr. v. Health Care Fin. Admin., DAB No. 1726 (May 30, 2000) (citation omitted).[12] In order for a facility to be in substantial compliance with this regulation, "a provider must have no deficiencies that pose a risk to resident health or safety greater than 'the potential for causing minimum harm.'" Id. (citing 42 C.F.R. § 488.301).

In this case, the Secretary found that Petitioner failed to adequately supervise Resident in order to prevent her from eloping, in violation of 42 C.F.R. § 483.25(h)(2). The Secretary found that Petitioner failed to take all reasonable steps necessary to secure its exit doors after discovering Resident's ability to flip the bypass switches and exit the building undetected. Petitioner argues that its electronic door locks were state-of-the-art and were installed within parameters dictated by state law.

As a participant in Medicare and Medicaid funding, Petitioner is obligated to ensure that "[e]ach resident receives adequate supervision and assistance devices to prevent accidents." 42

---

[12]The Health Care Financing Administration or HCFA has been reorganized into the Centers for Medicare and Medicaid Services.

10

C.F.R. § 483.25(h)(2). The regulation directs a facility to take all reasonable precautions to prevent situations that have the potential for causing harm to a resident. See <u>Woodstock Care Ctr. v. Thompson</u>, 363 F.3d 583, 589 (6th Cir. 2003). Petitioner, as of September 19, 2004, knew that Resident could disable the electronic door locks and exit the facility undetected. Accordingly, Petitioner had no means of adequately supervising Resident or preventing accidents once she exited the facility undetected.

Petitioner challenges the Secretary's determination, contending that Resident's elopements were few and far between, and resulted in no injury. Contrary to Petitioner's assertion, however, substantial evidence supports the Secretary's finding of a failure to adequately supervise and prevent accidents. It is uncontested that Resident was able to elope from Petitioner's facility undetected despite the fact that Petitioner knew Resident was eloping by flipping the bypass switch and exiting through the back door. This knowledge placed Petitioner on notice and obligated Petitioner to take steps necessary to adequately supervise Resident. Additionally, the fact that Resident eloped multiple times undetected after September 19, 2004, also provides substantial evidence in support of the Secretary's findings. See <u>Woodstock Care Ctr. V. Health Care Fin. Admin.</u>, DAB No. 1726 (May 30, 2000) (The ALJ held that "evidence which shows that residents were able to escape Petitioner's facility on multiple occasions, is

ample evidence of a lack of supervision of these residents."). Substantial evidence, therefore, supports a finding that Petitioner was not in substantial compliance with 42 C.F.R. § 483.25(h)(2).

Petitioner further contends that Resident's lack of an injury during her elopements compels a conclusion that she was adequately supervised. The fact that no injury occurred while Resident eloped, however, is not factually dispositive on the issue of adequate supervision. The absence of an injury does not indicate whether Resident was adequately supervised or merely fortunate. In this case, the Secretary analyzed the fact that Resident was an elderly woman who ambulated using a walker and was at a high risk for experiencing falls, and came to the conclusion that her exposure to the outdoor terrain put her in immediate jeopardy of sustaining an injury. Substantial evidence supported the Secretary's conclusion that Resident's ability to avoid an injury was completely fortuitous.

Immediate Jeopardy

Petitioner challenges the Secretary's conclusion that Petitioner's noncompliance rose to the level of immediate jeopardy. The federal regulations governing inspections of nursing facilities classifies noncompliance violations based on the severity of risk to a resident. Immediate jeopardy is defined as "a situation in which the provider's noncompliance with one or more requirements of

12

participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. The second level of noncompliance is defined as a situation where there is "[n]o actual harm with a potential for more than minimal harm, but not immediate jeopardy." 42 C.F.R. § 488.404(b)(1)(ii). The lowest level violation is found when there is "[n]o actual harm with a potential for minimal harm." 42 C.F.R. § 488.404(b)(1)(I).[13]

The Secretary determined that Resident's ability to elope undetected resulting in unsupervised exposure to areas beyond the confines of the facility walls constituted immediate jeopardy. We are required to uphold this determination unless we find it to be clearly erroneous. See Liberty Commons Nursing & Rehab Ctr. - Johnston v. Leavitt, 241 Fed. Appx. 76, 81 (4th Cir. 2007) (unpublished) (citing 42 C.F.R. § 498.60). In reviewing the facts, the ALJ determined that Resident's advanced age, Alzheimer's disease, and debilitating physical condition put her at risk of, inter alia, falling down, getting lost, or being hit by a car in the parking lot. In evaluating these potential consequences, the ALJ concluded that the elopements were likely to cause serious

---

[13]The level of infraction determines the civil penalty. In situations deemed to constitute immediate jeopardy, "[p]enalties in the range of $3,050 - $10,000 per day are imposed." 42 C.F.R. § 488.438(a)(1). Likewise, "[p]enalties in the range of $50 - $3,000 per day are imposed for deficiencies that do not constitute immediate jeopardy, but either caused actual harm, or caused no actual harm, but have the potential for more than minimal harm." Id. § 488.438(a)(2).

injury or harm to Resident. The Secretary's conclusion is not clearly erroneous because patients suffering from conditions similar to Resident's have wandered from their facility and been involved in accidents. See Golden Villa Nursing Home, Inc. v. Smith, 674 S.W.2d 343 (Tex. App. 1984) (resident who eloped was hit by person on motorcycle); Lincoln Manor, Inc. v. Dep't of Pub. Health, 832 N.E.2d 956, 358 Ill. App. 3d 1116 (2005) (resident eloped from facility and sustained a fractured hip as a result of a fall); Ostrom v. Manorcare Health Servs., 2007 U.S. Dist. LEXIS 4106 (E.D. Mich. Jan. 22, 2007) (resident with Alzheimer's disease who eloped suffered severe head trauma after tripping over a light post). Moreover, the fact Resident eloped on multiple occasions lends more strength to the ALJ's conclusion. See Woodstock Care Ctr. v. Thompson, 363 F.3d 583, 590 (6th Cir. 2003) (The court, in considering the frequency of the residents' elopements as well as "the vulnerable state of the residents, and the dangers of the outside world to residents in such a state," held the conclusion that the residents' "elopements would likely cause serious injury was supported by substantial evidence.").

Petitioner further claims that the Secretary's conclusion is unfounded for two reasons: (1) because Petitioner undertook certain efforts to prevent Resident from eloping, and (2) because Resident never sustained any injury while outside the facility. These arguments are without merit, however, because the Secretary

14

can make a finding of immediate jeopardy notwithstanding a facility's attempt to take remedial measures or the lack of an actual injury to a resident.

The purpose of the regulation, 42 C.F.R. § 483.25(h)(2), is to prevent not only actual harm, but also likely harm to a resident. Therefore, a facility is to take all reasonable precautions to prevent unintended events that can cause a resident bodily injury. Woodstock, 363 F.3d at 589. "The question whether [a facility] took all reasonable precautions is highly fact-bound and can only be answered on the basis of expertise in nursing home management. As such, it is a question the resolution of which we defer to the expert administrative agency." Id.


Petitioner's Responses to Resident's Elopements

Petitioner claims that this court should reverse the Secretary's decision to impose a CMP because Petitioner attempted to take remedial measures to prevent Resident from continuing to elope. Specifically, Petitioner challenges the Secretary's determination that Petitioner's attempts were not sufficient. In evaluating a facility's response to a risk of harm to a resident, courts focus on whether a facility "had taken reasonable steps to respond to the residents' need for supervision." Woodstock Care Ctr. V. Health Care Fin. Admin., DAB No. 1726 (May 30, 2000). This "regulatory standard does not amount to strict liability or require

15

absolute success," as there is "an element of reasonableness [that] is inherent in the regulation's requirements."  Crestview Parke Care Ctr. v. Thompson, 373 F.3d 743, 754 (6th Cir. 2004) (citation and internal quotations omitted).  The standard does require, however, that a facility do more than simply respond to a problem, because it imposes a burden of taking "all reasonable precautions." Woodstock, 363 F.3d at 589.  DAB tribunals interpret this to mean that "a facility is not required to do the impossible or be a guarantor against unforeseeable occurrence, but is required to do everything in its power to prevent accidents."  Koester Pavilion Petitioner v. Health Care Financing Administration, DAB No. 1750 (Oct. 18, 2000).

In order to determine whether Petitioner's responses were reasonable, this court looks at two factors:  whether a risk of an "accident" was foreseeable and whether the facility's response was adequate under the circumstances.  See Woodstock Care Ctr. V. Health Care Fin. Admin., DAB No. 1726 (May 30, 2000).  In this case, Petitioner learned on September 19, 2004, that Resident was flipping the bypass switches and walking out the exit doors. Despite Resident's unique ability to operate the switches, all of Resident's future elopements became foreseeable the moment Petitioner realized Resident was capable of operating the bypass switches.

16

Petitioner's reaction to Resident's behavior was not adequate because it was not tailored to address her relatively high functional capacity. In order to prevent Resident from eloping, Petitioner placed paper covers over the switches that release the locks on the exit doors. Petitioner claimed that this would confuse and distract Resident, thus preventing her from locating the switches. The Secretary did not consider this response to be adequate under the circumstances and substantial. We agree.

When deciding to cover the bypass switches with paper, Petitioner did not consider Resident's "novel talent for operating the bypass switches." (P.B. at 43.) Though Petitioner's tactics might have worked on less functional Alzheimer's patients, Petitioner should have employed measures designed to prevent someone with Resident's level of cognitive ability from operating the bypass switches. At the very least, Petitioner could have initially combined the paper covers with a proven measure, such as one-on-one supervision to analyze whether the paper covers were effective.[14] Assuming such measures were not feasible, Petitioner's actions still never addressed the ultimate problem, Resident's

---

[14]The applicable regulations require Petitioner to take all reasonable precautions to prevent accidents. See, 42 C.F.R. § 483.25(h)(2). Petitioner contends that one-on-one supervision as suggested by the ALJ and DAB Appellate Board compromises a resident's dignity, and is therefore not a preferred method of supervision. Petitioner, however, provides no authority to support a conclusion that safeguarding a resident's dignity or independence is preferred to protecting a resident against accidents. Accordingly, we find no merit in Petitioner's position.

ability to exit the facility without detection. Considering the other possible responses available and known to Petitioner at that time, including the use of the Wander Guard alarm or full-time, one-on-one supervision, Petitioner cannot claim that covering the switches with paper was reasonable.

This conclusion is further supported by the fact that Resident was previously housed in a locked unit. In assessing the proper level of care required for Resident, Petitioner acknowledged that she was at a high risk for elopement. This risk did not decrease when she moved to an unlocked unit; in fact, her risk of elopement increased. Petitioner's reply brief admits that its staff "knew that they could not assure the Resident's safety on an open, unlocked unit." (P.R. 15.) Furthermore, Petitioner states that it was the staff's professional judgment that Resident required greater supervision in an unlocked unit. Id. Accordingly, Petitioner cannot show that the Secretary's findings were not supported by substantial evidence or that his legal conclusions were clearly erroneous.

Resident Suffered No Actual Harm

Petitioner's argument that Resident never sustained any actual injury during her elopements is not a proper basis to set aside the Secretary's finding of immediate jeopardy. In fact, the DAB has "held that the regulations do not require any finding of actual

18

harm to justify a determination that immediate jeopardy to residents exists." Southridge Nursing and Rehab. Ctr. v. Health Care Fin. Admin., DAB No. 1778 (July 30, 2001) (citation and internal quotations omitted). According to the plain language of the regulation, a finding of immediate jeopardy only requires that a nursing facility's noncompliance is likely to cause harm to a resident. See 42 C.F.R. § 488.301. As mentioned above, Resident's condition made her likely to suffer harm if unsupervised outside of Petitioner's facility. This is not a case where a resident eloped a single time, or where the resident was retrieved immediately upon her decision to exit. Here, Resident continued to exit the facility without the staff's knowledge. Additionally, on at least two occasions, the staff was unsure how long Resident had been outside the facility. The fact that she eloped on numerous occasions increased the possibility that she would suffer an injury. See Woodstock Care Ctr. v. Thompson, 363 F.3d 583, 590 (2003) ("Even in the absence of 'actual harm,' a 'widespread potential for more than minimal harm' is sufficient to sustain the CMP.") (citing 42 C.F.R. § 488.301). Therefore, Petitioner's argument that Resident always found her way back to the facility unharmed is not persuasive. See Southridge, DAB No. 1778 (July 30, 2001) ("Just because the resident fortuitously did not suffer any actual harm does not eliminate the likelihood that harm could have

19

befallen him in the course of his time outside."). Accordingly, we affirm the Secretary's determination of immediate jeopardy.

Due Process

Petitioner claims it was deprived of procedural rights during the hearing before the ALJ because the Secretary changed its reason for imposing a CMP and the ALJ thereafter denied Petitioner an opportunity to submit additional evidence through direct witness testimony. Because we find Petitioner's argument to lack merit, we will not upset our decision to affirm the rulings below.

Petitioner notes that the DAB lacks uniform rules for conducting a hearing to review the imposition of a CMP instead allowing the ALJs to use their discretion setting the procedure for a hearing. The Medicare Act at (42 U.S.C. § 1395i-3(h)(2)(B)(ii)) specifically grants discretion to the Secretary to conduct CMP-related proceedings by incorporating by reference 42 U.S.C. § 1320a-7a(c)(4). Under 42 C.F.R. § 498.60, the discretion regarding hearing procedures is passed along to the ALJ. In this case, the presiding ALJ issued an initial order outlining the procedures to be used for the hearing. The order requested that the parties submit written direct testimonial evidence of all potential witnesses to be used at the hearing, and to make these witnesses available for cross-examination during the hearing. (J.A. 41-42.) Once this prehearing exchange was complete, neither party could

20

supplement its evidence unless it made a motion to do so.  (J.A. 40.)

In accordance with the ALJ's directives, CMS submitted a brief and direct testimony of its surveyor in May 2005.  Approximately 30 days later, Petitioner responded by submitting direct witness testimony and a prehearing brief.  After Petitioner's submission, CMS moved to supplement its evidence with additional testimony of the surveyor in rebuttal to certain claims made by Petitioner's employees.  The ALJ granted this motion.  Petitioner did not supplement or amend its evidence.[15]

Petitioner claims it was prejudiced by the ALJ's procedures regarding witness testimony.  Specifically, Petitioner claims that it was denied the opportunity to supplement its case with additional testimony regarding the efficacy of its electronic door-locking system because the ALJ's rules prevented witnesses from testifying at the hearing unless they were cross-examined.  The record, however, shows that the only obstacle Petitioner faced in submitting additional evidence was its own failure to organize and submit such evidence.  The record shows both that the ALJ granted Petitioner's motion to supplement (J.A. 134-35), and that Petitioner failed to submit additional evidence. (J.A. 526).  We

---

[15]Petitioner did make a motion to submit supplemental evidence in the form of direct testimony of Randy Warden, the installer of Petitioner's alarm system.  The ALJ granted this motion, but Petitioner never submitted any additional materials.

21

fail to see how the Petitioner's procedural due process rights were prejudiced by the ALJ's procedures.

Even assuming that Petitioner proffered the direct witness testimony it claims was wrongly omitted from the ALJ's consideration, this evidence would not have affected the ALJ's analysis. Petitioner sought to submit testimony of Randy Warden, the installer of Petitioner's door-locking system, in an attempt to show that the system Petitioner installed was the one preferred by the State of North Carolina and conformed to all the Life Safety Code requirements. Such testimony, however, was irrelevant to the determination of whether Petitioner was in substantial compliance with the regulation requiring adequate supervision of its residents. Though the electronic locking system may have been state-of-the-art at the time, the system was still unable to alert Petitioner's staff of Resident's elopements. This required Petitioner to take additional steps to monitor Resident and prevent her from eloping undetected. Accordingly, this evidence was irrelevant to the determination that Petitioner was not in substantial compliance with 42 C.F.R. § 483.25(h)(2).

The remainder of Petitioner's procedural due process arguments are also without merit. Petitioner's attempt to analogize its case to Crestview Parke Care Ctr. v. Thompson, 373 F.3d 743, 749 (6th Cir. 2004), is unpersuasive because Petitioner was afforded an oral hearing and was given an opportunity to present its case, and the

Secretary did not rely on any post hoc rationalizations to support its contention that Petitioner failed to adequately supervise Resident.  Petitioner, therefore, suffered no prejudice nor injury from the ALJ's hearing procedures.

Conclusion

For the reasons set forth above, the final judgment of the DAB is

AFFIRMED.

SHEDD, Circuit Judge, dissenting:

Liberty Commons must comply with 42 C.F.R. § 483.25(h), which provides: "Accidents. The facility must ensure that . . . (2) each resident receives adequate supervision and assistance devices to prevent accidents." In interpreting this regulation, the DAB has held a facility is not subject to strict liability but a reasonableness standard, requiring that a facility take all "reasonable steps to respond to the residents' need for supervision." Woodstock Care Ctr. v. Healthcare Fin. Admin., DAB No. 1726 (May 30, 2000).[*]

Liberty Commons claims that it met the DAB's reasonableness standard by responding to Resident #2's ("the Resident") continued elopements by increasing remedial measures to prevent future elopements. The last of these remedial measures involved the covering of door lock override switches with paper, a step taken to prevent the Resident from operating the switches to unlock exit doors by diverting her attention. After Liberty Commons covered the switches with paper, the Resident did not elope for a period of approximately six weeks.

---

[*]The DAB also interprets the regulation to mean that "a facility is not required to do the impossible or be a guarantor against unforeseeable occurrences, but is required to do everything in its power to prevent accidents." Koester Pavilion v. Healthcare Fin. Admin., DAB No. 1750 (Oct. 18, 2000). Clearly, though, the DAB does not apply this interpretation literally. Doing so would result in a violation in every case because some further step to prevent accidents is always available.

Under the DAB's interpretation of § 483.25(h), Liberty Commons' actions should have been analyzed for reasonableness. The agency, however, failed to do so. The state surveyor who inspected Liberty Commons' facility testified that she did not evaluate the reasonableness of the paper covers because the resident "was still getting out of the facility. It was a non-issue." J.A. 259. Likewise, the ALJ did not address this remedial measure. Only the DAB did so, and its analysis failed to comply with its own announced standards.

The DAB found that Liberty Commons' response was not "reasonable and effective" because it ultimately failed to keep the Resident from eloping. However, the DAB never analyzed the reasonableness of Liberty Commons' remedial steps but focused its discussion solely on their effectiveness. In other words, the DAB failed to consider the possibility that a facility can take appropriate, reasonable steps to prevent accidents which in the end prove ineffective. Thus, the DAB engaged in no reasonableness analysis at all but simply an effectiveness analysis. Such an analysis for "effectiveness" is simply an application of strict liability, in violation of the DAB's standards.

Because there is some evidence in the record indicating that Liberty Commons acted reasonably to prevent the Resident's elopements, I would vacate and remand for further consideration using a proper reasonableness analysis.

25